## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DUEWARD W. CRANFORD, II; JON COLBURN; WILLIAM BRAUN; and the CITIZENS EQUAL RIGHTS ALLIANCE, INC.; | ) ) ) ) |
| | ) CIVIL ACTION |
| *Plaintiffs*, | ) ) No. |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF THE INTERIOR; | ) **COMPLAINT FOR FEDERAL** ) **CIVIL AND CONSTITUTIONAL** ) **RIGHTS VIOLATIONS** |
| UNITED STATES BUREAU OF INDIAN AFFAIRS; | ) **AND DECLARATORY,** ) **INJUNCTIVE AND MONETARY** ) **RELIEF** |
| NATIONAL INDIAN GAMING COMMISSION; | ) |
| UNITED STATES DEPARTMENT OF JUSTICE; | ) ) ) |
| DOUG BURGUM, SECRETARY OF THE OF THE INTERIOR, *individually and in his official capacity*; | ) ) ) ) |
| GREGORY ZERZAN, ACTING SOLICITOR, UNITED STATES DEPARTMENT OF THE INTERIOR, OFFICE OF THE SOLICITOR, *individually and in his official capacity*; | ) ) ) ) ) |
| ERIC SHEPARD, ASSOCIATE  SOLICITOR, INDIAN AFFAIRS, UNITED STATES DEPARTMENT OF THE INTERIOR, OFFICE OF THE SOLICITOR, *individually and in his official capacity;* | ) ) ) ) ) ) |
| BRYAN MERCIER, DIRECTOR, UNITED STATES BUREAU OF INDIAN AFFAIRS, *individually and in his official capacity*; | ) ) ) ) |
| AMY DUTSCHKE, REGIONAL DIRECTOR, PACIFIC SOUTHWEST REGIONAL OFFICE, UNITED STATES BUREAU OF INDIAN AFFAIRS, AND HEAD OF THE CALIFORNIA | ) ) ) ) |

FEE TO TRUST CONSORTIUM, *individually* )
*and in her official capacity*; )
)
PAMELA BONDI, UNITED STATES )
ATTORNEY GENERAL, *individually and* )
*in her official capacity*; )
)
ADAM R.F. GUSTAFSON ACTING )
ASSISTANT UNITED STATES )
ATTORNEY GENERAL, UNITED STATES )
DEPARTMENT OF JUSTICE ENVIRONMENT )
AND NATURAL RESOURCES DIVISION, )
*individually and in his/her official capacity*; )
)
GINA ALLERY, DIRECTOR, OFFICE OF )
TRIBAL JUSTICE, UNITED STATES )
DEPARTMENT OF JUSTICE, *individually* )
*and in her official capacity*; )
)
ACTING DIRECTOR, TRIBAL RESOURCES )
SECTION, UNITED STATES DEPARTMENT )
OF JUSTICE, ENVIRONMENT AND )
NATURAL RESOURCES DIVISION, )
*individually and in his/her official capacity*; ) )
)
        *Defendants*. )
_____)_____

## FEDERAL CIVIL AND CONSTITUTIONAL RIGHTS VIOLATION COMPLAINT FOR DECLARATORY, INJUNCTIVE AND MONETARY RELIEF

Plaintiffs Cranford, Colburn, Braun and the Citizens Equal Rights Alliance, through their undersigned attorneys, file this Complaint for Civil Rights Violations, Declaratory, Injunctive and Monetary Relief against Federal and Individual Defendants for their ongoing violation of Plaintiffs' constitutional rights to due process and equal protection of the law under the Constitution's Fifth and Fourteenth Amendments, and for their ongoing violation of Plaintiffs' civil rights under 42 U.S.C. § 1981 as enforced through 42 U.S.C. § 1983.  Plaintiffs also allege that Federal and Individual Defendants engaged in a conspiracy against Plaintiffs by approving the federal recognition, fee-to-trust applications and the Indian gaming applications for the Ione Band of Miwok Indians under 42 U.S.C.§ 1985(3).  Plaintiffs allege as follows:

## NATURE OF ACTION

1.      This Complaint challenges the unconstitutional inclusion, on November 2, 1994, by the U.S. Department of the Interior and Bureau of Indian Affairs, of the Ione Band of Miwok Indians in the list of Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs under the Federally Recognized Indian Tribe List Act.

2.      This Complaint also challenges the unconstitutional acceptances into federal trust by the U.S. Department of the Interior and Bureau of Indian Affairs on behalf of the Ione Band of Miwok Indians, first, on March 20, 2020, of ten (10) parcels of land under Section 203 of the Indian Land Consolidation Act (25 U.S.C. § 2202), and then, on October 17, 2024, of two (2) parcels of land under Section 5 of the Indian Reorganization Act (25 U.S.C. § 5108), each parcel of which had been owned by a private donor in fee simple and located in Amador County and Plymouth, California.

3.     The Ione Band of Miwok Indians had been deemed eligible for the acceptance of all twelve (12) parcels into federal trust only under 25 U.S.C. § 5108 based on the agency's May 24, 2012 Record of Decision, although the Band was not "recognized" in 1934 as the U.S. Supreme Court determined was necessary to secure such treatment in *Carcieri v. Salazar*, 555 U.S. 379 (2009). The Record of Decision never mentioned anything about the Indian Land Consolidation Act.

4.     In addition, a thirteenth (13th) parcel of land, tax parcel # 010-160-010-000, was accepted into trust on March 21, 2024 without application or notice to anyone. The land parcel was identified as being located in Fresno County, the wrong county, in complete violation of Part 151 of the Code of Federal Regulations for taking lands into trust.

5.     These Interior Department actions in dispute in this case engender the fundamental confrontation of two distinct federal government "trusts" with corresponding trust obligations. The first trust is the Indian trust relationship the United States claims was established in *Worcester v. Georgia*, 31 U.S. 515 (1832). The second trust, is the one created by the adoption of the Fourteenth Amendment that requires both the federal government and state governments to adhere to due process and equal protection of the law for all. These two "trusts" are now in direct conflict.

6.     These Interior Department actions specifically violate the structural, due process and equal protection requirements that are based on the Due Process and Equal Protection Clauses of the Fifth, Tenth, Thirteenth and Fourteenth Amendments to the United States Constitution that form a trust relationship between all the People and the federal government of the United States. This trust fulfills the foundational obligation of the Federal Government to treat all United States citizens as equal sovereign individuals, regardless of race, creed or color, and give equal opportunity under all laws.

7.      These Interior Department actions have been undertaken pursuant to an unconstitutional "trust" that is based on the Catholic Pope's Doctrine of Discovery and ostensibly engenders a common law fiduciary (private trust) obligation of the Federal Government to provide "protection" only to persons of indigenous origin deemed "uncivilized." This trust created by the Pope just after the discovery of the Americas was intended to require "civilization" of all persons in the newly discovered lands.

8.      The Doctrine of Discovery was intended to limit the absolute territorial 'war' powers of the Doctrine of Conquest. It was universally understood that all lands and persons living in conquered lands were subject to the absolute authority of the conquering army and its government.

9.      British law at first distinguished between the indigenous natives they named "Indians" and the European descendants of the British settlers. Then King George III developed a dislike of the European descendants that were demanding more and more rights like Englishman.

10.     Under the Proclamation of 1763, he asserted direct control over the Indians, banning the colonists from exercising any authority with or over them for all trade. This began further losses of rights to the European descendants that led to the Declaration of Independence and Revolutionary War.

11.     The British House of Lords acting as the Supreme Court determined in 1772 that the King's authority to require the American colonies to accept the African slave trade was acceptable but could not be applied in the British Isles without risking all of the rights gained under British common law.  Its decision made no distinction between types of persons in the colonies. All persons in the American colonies were placed under the King's absolute authority to determine their individual status as a matter of martial law applying in the territories of Great Britain.  *See*

*Somerset v. Stewart*, (1772) 87 ER 499, 509-510.

12.    These two trust doctrines have now come into direct conflict as the result of the Executive branch actions of multiple presidential administrations maintaining the extra-constitutional special "Indian" trust relationship said to exist between the United States and "recognized" Indian tribes.

13.    The federal government continues to unconstitutionally use the Indian trust to violate the structure of the Constitution by claiming the authority, as the successor to King George III and his Proclamation of 1763, to remove approximately 228 acres of California fee lands and convert them into federal territorial public lands by accepting these lands into trust for the Ione Band of Miwok Indians, under the Indian Reorganization Act and the Indian Land Consolidation Act, to enable the Band to construct and operate a casino under the Indian Gaming Regulatory Act. These actions discriminate against the Plaintiffs' rights of U.S. and State citizenship violating their constitutional and civil rights under 42 U.S.C. § 1981(a) protected by the Thirteenth and Fourteenth Amendments.

14.    42 U.S.C § 1981(a) states:

> **(a) Statement of equal rights**
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

15.    It is the "full and equal benefit of all laws"..."for the security of persons and property as is enjoyed by white citizens" that Plaintiffs are claiming have been violated by the Federal and Individual Defendants.

16.     Because the Indian Trust has been applied by the federal government to employ territorial war powers to keep the "Indians" in dependent "ward" status, a power has been preserved that can completely deny all civil rights and liberties to all United States and State citizens.

17.     To maintain the constitutional structural balance and keep our constitutional rights as Americans, we must end the Indian Trust and deny that the federal government has the same sovereign powers as King George III.  We also must ensure that the United States government only has the sovereign authority enumerated in the Constitution, including the Fourteenth Amendment.

18.     The Federal and Individual Defendants named in this Complaint focused only on fulfilling the United States' preferential Indian trust obligation they claim is owed to the Ione Band of Miwok Indians. A series of very questionable and unconstitutional federal actions were taken to "recognize" a so-called "Indian tribe" and then to establish a so-called Indian "reservation" from lands placed into federal "trust," and thereafter, to allow this so-called "Indian tribe" on its alleged trust lands to pass gaming and business leasing ordinances enabling it to build, open and operate a gambling casino.

19.     Plaintiffs have the right to control their local government to protect their individual rights, private property and liberties against an unconstitutional claim of federal preemption solely based on the Indian trust relationship.

20.     The Indian Commerce Clause, Art. 1, Sec. 8, Cl. 3, gives no authority to the federal government or Congress to preempt state jurisdiction by claiming to remove physical land from sovereign state jurisdiction by calling it "Indian country" once a State has been created.

21.     These 13 parcels that have unconstitutionally been taken into "trust" status are now

being prepared for construction of a casino, immediately adjacent to the City of Plymouth, California, and within sight of Plaintiffs' and their family members' homes.

22.     This is all happening to the Plaintiffs because the United States, through the U.S. Department of Justice and Department of Interior, is refusing to admit that the Fourteenth Amendment applies directly to the federal government and creates its own equal protection trust that applies to all of the People and the States. *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 143 S.Ct. 2141 (2023); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995).

23.     The City of Plymouth is a small town that has fought to keep its historic downtown area an interesting and vibrant location.  Plymouth has a population of 9,000. It is located in the foothills of the Sierra Nevada mountains in California's "gold country."

24.     Federal and Individual Defendants claim to exercise such Indian trust powers for the benefit of the Ione Band of Miwok Indians, but Plaintiffs will show that they actually exercise such powers primarily for the benefit of the United States as asserted since Reconstruction. *See Heckman v. United States*, 224 U.S. 413, 438 (1912) ("A transfer of the allotments is not simply a violation of the proprietary rights of the Indian. It violates the governmental rights of the United States").

25.     Because this case is about the continuous misuse and abuse of the Indian trust relationship and the Indian policy of promoting tribal sovereignty to avoid the specific requirements that Congress set in the specific acts that allow tribal recognition, land transfers into trust and Indian gaming, application of the federal Administrative Procedures Act does not encompass Plaintiff's claims, requiring Plaintiffs to broaden their request to enforcing their civil rights for an adequate legal remedy.

26.     Plaintiffs seek injunctive, declaratory, equitable and monetary relief on account of Federal and Individual Defendants' unconstitutional acts exceeding the enumerated authority of the Constitution and violating the Fifth, Tenth, Thirteenth and Fourteenth Amendments as described above using the Civil Rights Act of 1866 as enforced through the Civil Rights Act of 1871.

## JURISDICTION

27.     This Court has original subject matter federal question jurisdiction over these claims pursuant to 28 U.S.C. § 1331, because they arise under the Constitution, laws, and treaties of the United States, including *inter alia*, the Indian Reorganization Act (25 U.S.C. § 5108), the Indian Land Consolidation Act (25 U.S.C. §§ 2202, 2210 et seq.), the Indian Gaming Regulatory Act (25 U.S.C. § 2701 et seq.), 18 U.S.C. § 1151, 25 U.S.C. § 177, the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. § 5101 note), the Civil Rights Act of 1866, 14 Stat. 27, 39th Cong. Ch. 31 (42 U.S.C. §§ 1981, 1983), the Civil Rights Act of 1871, 17 Stat. 13, 42 Cong. Ch. 22 (42 U.S.C. §§ 1983, 1985), and the Act of May 19, 1937, 50 Stat. 188 (25 U.S.C. § 412a).

28.     This Court also has original and supplemental (ancillary) jurisdiction pursuant to 28 U.S.C. § 1367(a), to hear claims raising issues of state law that are related to a federal claim(s) because they bear a logical relationship to the aggregate core of operative facts of the main claim(s) which meets the requirements of federal question and/or diversity jurisdiction.

29.     This Court also has the authority to grant injunctive, declaratory, and restorative relief under 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 and 65.

## VENUE

30.     Venue is proper in this Court under 28 U.S.C. § 1391, because it is where most of the Defendant federal executive agencies' primary offices are located, where the Congress and the

President conduct their legislative and executive activities, where a substantial part of the events giving rise to the claim have occurred, and where at least one, if not several, of the individual Defendants is believed to reside.

## STANDING

31.    It has long been the position of Federal and Individual Defendants that all persons of one-half or more Indian blood and/or persons of Indian descent who have been continuously affiliated with other Indians in a group that can be "recognized" by the United States as an "Indian tribe" are subject to the exclusive jurisdiction of the United States government while not being subject to the Constitution under an Indian trust relationship that allows Defendants to promote expanding tribal sovereignty as declared federal Indian policy to discriminate against all other persons and their rights to locally control their communities under state jurisdiction.

32.    Plaintiffs in this Complaint assert that their rights as United States and California citizens subject to the Constitution have been deemed irrelevant and/or completely ignored by Federal and Individual Defendants resulting in actual racial discrimination so that the federal government may claim the extra-constitutional authority of the Indian trust relationship by maintaining the "Indians" in this "trust" status as "wards" of the Nation.

33.    Categorizing a race-based group as "wards of the nation," as the United States Supreme Court, in *United States v. Kagama*, 118 U.S. 375, 382 (1886), stated had been previously done in *Cherokee Nation v. Georgia*, 30 U.S. 1 (1831) and *Worcester v. Georgia*, *supra*, created a political relationship between the United States and Indian tribes that perpetually treats individual Indian persons as "wards"  under the Doctrine of Discovery,  incapable of handling the duties of citizenship in violation of the Thirteenth Amendment.

34.    Federal and Individual Defendants use the definition of "Indian country" in 18 U.S.C. § 1151 to unconstitutionally remove persons classified as "Indians" from their legal status as "citizens" of the United States and of the State of California, in violation of the Fourteenth Amendment.[1]

35.    The categorization known as "Indian country" allows the United States to treat "Indians" as other than "citizens" falling under the jurisdiction of any State or local government, and thus, as if they were still living in an "uncivilized" colony or territory not yet subject to the Constitution as defined by the federal courts interpreting the "Indian trust" relationship from the Doctrine of Discovery.

36.    When fee simple real property under state jurisdiction is accepted into federal trust status it is converted under federal law into being "Indian country." *See* 18 U.S.C. § 1151.

37.    Each one of the Individual Plaintiffs lives within sight of the 12 land parcels that are claimed to have been taken into federal "trust" status that removes these lands as "Indian country" from all local planning, zoning and enforcement of any local municipal ordinances. One Individual Plaintiff owns real property directly adjacent to several of the federally owned parcels. Each one of these Individual Plaintiffs must drive by these land parcels to access their grocery store.  This proposed tribal casino project has adversely affected their property values and threatens to destroy the use and quiet enjoyment of their individual properties.

38.    Each of the Individual Defendants is also a member of the Citizens Equal Rights Alliance ("CERA"), a South Dakota non-profit corporation established to help protect and support the constitutional rights of all people by providing education and training concerning constitutional rights and by participating in legal actions that adversely impact constitutional rights.  The civil

---

[1] *See* Merriam-Webster, *Citizenship* https://www.merriam-webster.com/dictionary/citizenship.

rights of CERA and its member-Plaintiffs are similarly adversely affected by Federal and Individual Defendants' ongoing unconstitutional conduct.

39.    Federal and Individual Defendants' administration of laws that apply only to "Indians" which unconstitutionally remove them from being citizens of the United States and the State of California in which they reside breaches the U.S. Constitution's structural separation of powers and federalism protections. These structural protections include the Constitution's Commerce, Territory/Property and Enclave Clauses, and the Fifth, Tenth, Thirteenth and Fourteenth Amendments, each of which is intended to preserve individual liberty and protect against government tyranny.

40.    As a direct and proximate consequence of Federal and Individual Defendants' continued actions unlawfully contravening these structural constitutional protections and federal statutes, each Plaintiff has been deprived of their individual right to equal protection under the laws and to the procedural due process of law necessary to protect their private property interests against such government action that the Fifth and Fourteenth Amendments guarantee. *Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 35 (D.D.C. 2018) (collecting cases); *Hill v. The United States Dept. of Interior*, No. 22-1781 (D.D.C. Oct. 19, 2023), slip op. at 13; *Cardenas v. Smith*, 733 F.2d 909, 912-913 (D.C. Cir. 1984).

41.    As a direct and proximate consequence of Federal and Individual Defendants' ongoing actions, Plaintiffs have suffered an injury-in-fact to their property values and rights to local government control that is concrete, particular, and fairly traceable to said Defendants' challenged actions and conduct and that is likely to be redressed/alleviated by a temporary restraining order and a favorable final judicial decision. *Collins v. Yellen*, 141 S. Ct. 1761, 1779, 1780, 1781 (2021); *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547, 1551 (2016); *Bond v. United*

*States*, 564 U.S. 211, 222 (2011); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Hill*, slip op. at 15-16; *Cnty. of Delaware, Pa. v. Dept. of Transp.*, 554 F.3d 143, 149 (D.C. Cir. 2009).

42.    Plaintiffs' request for nominal damages, moreover, satisfies the redressability element of standing because their claim is based on a completed violation of a legal right that is allowing the casino to be built on the disputed 13 parcels of land taken into trust. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 801, 802 (2021); *Hill*, slip op. at 16.

## THE PARTIES

43.    Plaintiff Dueward W. Cranford, II, along with his family, have lived and owned property in the City of Plymouth in Amador County, California since 1958. He owns and lives on five (5) acres in Amador County within two (2) miles of the proposed casino site.  His son and daughter and his three granddaughters live in Plymouth less than one (1) mile from and with an unobstructed view of the proposed casino.

44.    Plaintiff Jon Colburn has lived in his family home located in the City of Plymouth in the County of Amador, which he uses, in part, as an office for 47 years.  His home and office are approximately 3,416 feet away from the entryway of the new proposed casino, and he can see the proposed casino from his back porch.  Mr. Colburn's family home, now owned by his son, Keith Colburn, which was built in 1868 and has been in the family since 1939, is located 3,970 feet away from the trust land.  And his daughter and son-in-law have a two (2)-acre parcel adjacent to the northern boundary of the Ione Band's trust lands.

45.    Plaintiff William P. Braun has owned and lived, since 1995, on a 40-acre property that is located three (3) miles west of the City of Plymouth. These Plaintiffs are concerned that the only access to their property provided by a narrow secondary county road, which has become during the past 30 years a commuter traffic artery for people living in and near Plymouth, would

be overburdened by the proposed casino project.

46.    The Citizens Equal Rights Alliance, Inc. ("CERA") is a South Dakota non-profit corporation that has both Indian and non-Indian members in 34 states.   CERA was established to help protect and support the constitutional rights of all people by providing education and training concerning constitutional rights, and by participating in legal actions that adversely impact constitutional rights.

47.    Defendant United States Department of the Interior ("DOI") is the primary federal executive agency of the United States government that is responsible for protecting and managing the Nation's natural resources and cultural heritage, and the agency claims to honor its trust responsibilities or special commitments to American Indians, Alaska Natives, Native Hawaiians, and affiliated Island Communities.

48.    Defendant United States Bureau of Indian Affairs ("BIA") is the agency of the DOI charged with the responsibility of enhancing the quality of life of, promoting economic opportunity for, and protecting and improving the trust assets of federally recognized Indian Tribes and their individual Tribal members.

49.    Defendant National Indian Gaming Commission ("NIGC") is the DOI Agency comprised of a Chairman the President appoints with the advice and consent of the U.S. Senate, and two commission members the Secretary of the Interior appoints, having federal regulatory oversight responsibility over three classes of Indian gaming.

50.    Defendant United States Department of Justice ("USDOJ") is the executive agency of the United States "at the seat of Government" that was created on June 22, 1870, and charged with giving legal opinions to all heads of executive and military departments, and which has since continued to counsel Defendants DOI and BIA, and Defendant Interior Secretaries and BIA

Directors, to exercise extra-constitutional territorial "war" powers against States and their citizens in fulfillment of the federal government's claimed obligations under the "Indian trust" to promote tribal sovereignty, which deems Indian tribes and their members as dependent "wards" of the federal government.

51.     Defendant Doug Burgum has served as the United States Secretary of the Interior since February 1, 2025, is responsible for the direction and supervision of all operations and activities of Defendant DOI, including the discharge of the United States' general trust obligation to Indian tribes and their members.

52.     Defendant Gregory Zerzan serves as the Acting Solicitor in Defendant DOI's Office of the Solicitor, which provides legal counsel and advice to DOI, legal representation and other services to the Secretary, Deputy Secretary and the Assistant Secretaries of the Interior, and to all Department bureaus and offices.

53.     Defendant Eric Shepard has served, since at least 2020, as the Associate Solicitor, Indian Affairs in Defendant DOI's Office of the Solicitor, and has directly rendered legal advice to former Solicitors regarding the status of the Ione Band of Miwok Indians under the Indian Reorganization Act.

54.     Defendant Bryan Mercier serves as the Director of Defendant BIA in the Office of the Assistant Secretary for Indian Affairs, in part, discharging the duties of the Secretary with the authority and responsibility to protect and preserve American Indian trust assets held by the Federal Government for their benefit.   Prior thereto, he served as Regional Director for Defendant BIA's Northwest Region.

55.     Defendant Amy Dutschke has served as the Regional Director of Defendant BIA's Pacific Southwest Regional Office located in Sacramento, California, since October 10, 2010, and

she has, since that time, been known to be an enrolled member of the Ione Band of Miwok Indians. She previously served, since June 2000, as the Office's Deputy Regional Director for Trust Services, and "was instrumental in the development of the…California Fee to Trust Consortium."

56.     Defendant Pamela Bondi has served, since February 4, 2025, as the Attorney General of the United States overseeing and managing all of the administrative, litigation and settlement activities of Defendant USDOJ, including those of its Environment and Natural Resources Division ("ENRD") and its Office of Tribal Justice.

57.     Adam R.F. Gustafson has served, since early 2025, as the Acting Assistant United States Attorney General for Defendant USDOJ's Environmental and Natural Resources Division ("DOJ-ENRD"), which is responsible *inter alia* for bringing cases against those who violate federal environmental and Indian laws, and for defending the federal government in litigation arising under federal environmental and Indian law statutes.

58.     Defendant Gina Allery has served, since January 2025, as the Director of the Office of Tribal Justice ("OTJ") of Defendant USDOJ-ENRD, and OJC serves *inter alia* as the program and legal policy advisor to the Attorney General with respect to the treaty and trust relationship between the United States and Indian tribes. From 2022 to January 2025, Allery served as Deputy Assistant Attorney General for the Tribal Resources and Land Acquisition Sections of Defendant DOJ-ENRD.

59.     Defendant Acting Director of the Tribal Resources Section of Defendant USDOJ-ENRD, is responsible for litigating to protect lands held in trust for Tribes and individual Indian lands, as well as the rights and resources associated with those lands, and for litigating to defend challenges to decisions made by the Secretary of the Interior on behalf of Tribes.

14

**STATEMENT OF FACTS**[2]

**SPECIFIC ALLEGATIONS OF AGENCY ACTIONS
UNDERTAKEN BASED ON THE INDIAN TRUST**

60.    On November 19, 1992, former Chief Judge Emeritus, Lawrence A. Karlton, of the United States District Court for the Eastern District of California, in *Ione Band of Miwok Indians v. Burris*, No. CIV. S-90-993, reaffirmed that the Ione Band of Miwok Indians had "failed to establish that they are 'duly recognized' as an Indian tribe 'by the Secretary of the Interior.'" (Ex. 1).

61.    The case of *Ione Band of Miwok Indians v. Burris*, No. CIV. S-90-993, involved a dispute between various factions of Indians on a former Mexican land grant. The 48,000-acre Pico land grant was accepted by the American Public Lands Commission Court. At some time after 1900, the caretaker of the grant allowed 40 acres of the land grant to be occupied by the servants, laborers and any Indians remaining on the land grant. All the workers and Indians on the large grant were required to move to the 40 acres under historic Mexican law as inherited by California. This group was not an organized Indian tribe or affiliated with any Indian tribe that had an organized tribal government structure.

62.    Notwithstanding his adverse tribal recognition order in *Burris*, former Judge Karlton relied entirely upon "various [Indian] canons of construction" of federal statutes and doctrines, including "the canon requiring liberal construction in favor of Indians," to liberally interpret "the meaning of tribe," "'Indian land' or 'tribal land,'" and "aboriginal title." (Ex. 1).

63.    Employing the Indian canons of construction, as interpreted by the USDOJ policy of promoting tribal sovereignty, former Judge Karlton ruled that, despite their "lack of formal

_____

[2] A "Table of Exhibits" designated "Ex.-i" accompanies this Complaint.

recognition" as an Indian tribe, the Ione Band had a "right to maintain a claim" that their land rights fall under **the Indian Nonintercourse Act (25 U.S.C. § 177)** and applicable caselaw." (emphasis added).

64.    Employing the Indian canons of construction, former Judge Karlton also ruled that the Ione Band's "**complaint suffice[d] to provide a basis to infer the existence of a trust relationship between the United States and the Ione Band of Miwok Indians**…which has never been abandoned" at the same time, finding that the Ione Band was not formally recognized. (emphasis added). (Ex. 1). No appeal or formal application for recognition was filed.

65.    On March 22, 1994, Defendant DOI's former Assistant Secretary of Indian Affairs, Ada Deer ("Deer"), issued a Memorandum based on the special Indian trust relationship and Nixon Indian policy of promoting tribal sovereignty, directing the Defendant BIA to include the Ione Band on the list of federally recognized tribes. This unauthorized action was based on statements made in a 1972 letter written by former DOI-BIA Commissioner Louis Bruce, agreeing to accept a parcel of land to be held by the United States in trust for the Ione Band. No land was accepted into trust for the Ione Band in 1972 or 1973, however.

66.    On July 27, 1994, Deer issued a Memorandum without any statutory authority to the Area Director of the Sacramento Area Office of Defendant BIA reaffirming the recognition of of the Ione Band. (Ex. 2 at 1).

67.    The July 27, 1994 Deer Memorandum also reaffirmed that Defendant DOI "recognizes as one entity the entire group of Indians associated with the lands near the town in Amador County, California." (Ex. 2 at 1).

68.    The July 27, 1994 Deer Memorandum, in addition, reaffirmed that "[i]t was not the intent of the [Defendant DOI] letters and memoranda to recognize two distinct entities," and that

"[t]he Department is cognizant that the Ione Band is deeply divided among political factions." (Ex. 2 at 1).

69.    On September 15, 1994, Deer issued a response letter to the July 14, 1994 letter of Mr. Nicolas Villa, Jr. of Ione California, "request[ing] that Ms. Amy Dutschke be required to withdraw from participation in any discussions relating to the Ione Band of Indians" because of her role as Regional Director of the Sacramento Area BIA Office. (Ex. 3 at 1).

70.    The September 15, 1994 Deer Letter also confirmed that "[t]he Ione Band of Indians is now formally acknowledged and is within the administrative jurisdiction of the Sacramento Area Office" of Defendant BIA, which recognizes that "there is a potential for conflict of interest and that Ms. Dutschke has restricted involvement in Ione matters." (Ex. 3 at 1-2).

71.    The September 15, 1994 Deer Letter had referred to the "potential for a conflict of interest" surrounding Amy Dutschke's work at that time in connection with the Ione Band, because it had been believed that Amy Dutschke, who had then served as the Acting Assistant Area Director for Administration in the BIA's Sacramento Area Office, was "related" by family to Harold E. Burris, who was her uncle and the leader of the "Burris" faction of the Ione Band. *Id*.

72.    On November 2, 1994, the "Federally Recognized Indian Tribe List Act of 1994" was enacted into federal law as Title I of Public Law 103-454, 108 Stat. 4791 (codified at 25 U.S.C. § 5101 note), setting "tribal recognition" standards for the DOI.

73.    Section 104 of the Federally Recognized Indian Tribe List Act (25 U.S.C. § 5131) requires the Interior Secretary to "publish…annually on or before every January 30… in the Federal Register a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians."

74.     Sections 103(1)-(3) of the Federally Recognized Indian Tribe List Act (25 U.S.C. § 5130 note) set forth Congress's findings as follows: "Congress finds that – (1) the Constitution, as interpreted by Federal case law invests Congress with **plenary authority** over Indian affairs; (2) **ancillary to that authority, the United States has a trust responsibility to recognized Indian tribes**… (3) Indian tribes presently may be recognized by Act of Congress; by the administrative procedures set forth in part 83 of the Code of Federal Regulations denominated 'Procedures for Establishing that an American Indian Group Exists as an Indian Tribe'; **or** by a decision of a United States court…" (emphasis added).

75.     Since November 2, 1994, the Ione Band "has been on every tribal list published pursuant to the Federally Recognized Indian Tribe List Act" ("FRITLA"), despite its never having satisfied any of the requirements set forth in 25 U.S.C. § 5130 note (3) or the part 83 regulations.

76.     In an August 31, 1995 *amicus curiae* brief filed by DOI's former Solicitor, Scott Keep in *Ione Band of Miwok Indians v. Burris*, No. CIV. S-90-993, "in response to four issues raised by the court," the DOI stated that "[w]e can not say at this time that the land…on which the Ione Band of Miwok Indians reside…is 'Indian country.' The land is neither a reservation nor an allotment, but may be a dependent Indian community despite the fact that it may lack a restriction on alienation."

77.     The DOI had concluded that "[t]he land is **not** owned by a group which has reorganized pursuant to the Indian Reorganization Act of 1934 ("IRA") 25 U.S.C. § 476) so it cannot take advantage of some caselaw which holds that lands held in fee by such reorganized groups is subject to some restrictions on involuntary alienation." (emphasis added).

78.     The DOI, nevertheless, found that "[t]he Band could also argue that the land is a 'dependent Indian community' and therefore Indian country under 18 U.S.C. §

1151(b)…The…'dependent Indian community'…test is not whether the land has been called a 'reservation' or denominated 'trust land,' but whether the land has been validly set apart for the use of the Indians as such, under the superintendence of the Government….The setting aside may be by the tribe, operation of law, or outside government action."

79.    On August 6, 1996, former Judge Karlton dismissed the Ione Band's case because **the Band "d[i]d not have an identifiable government capable of suing or being sued…the magistrate judge's conclusion that there is no tribal government is clearly correct."** (emphasis added). (Ex. 4 at 4).

80.    Former Judge Karlton found that "[i]t [was] not disputed by the defendants and counterclaimants that the plaintiff tribe [was] without a legitimate government and that therefore there [was] **no** individual with authority to act on its behalf," and that "**no** counsel [could] be retained in the absence of a contract with the U.S. Government, on approval from the tribal government…In the absence of a ruling governmental body or individual, the tribe is **not** authorized to be represented in this suit." (emphasis added). (Ex. 4 at 2, n.1). The Court issued its decision despite the Ada Deer letter and it should have resulted in the letter being withdrawn or cancelled.

81.    Former Judge Karlton then ordered all parties to show cause within 20 days of the order's effective date "why a declaratory judgment should not be entered noting the power of the County to exercise jurisdiction over the land in issue pending challenge by either the United States or a properly constituted and recognized tribal government." Neither the United States nor any properly constituted and recognized tribal government came forward with any cause. (Ex. 4 at 6).

82.    On September 20, 2004, **more than eight (8) years after** the Karlton show cause order, the Ione Band submitted a request to the National Indian Gaming Commission for an opinion

on whether 228.04 acres of land located near the City of Plymouth, in Amador County, California (Plymouth Parcels) would qualify as "Indian lands" within the meaning of the Indian Gaming Regulatory Act ("IGRA")'s Restored Lands exception to the general prohibition against Indian tribes conducting gaming activities on lands acquired in trust after October 17, 1988.

83.     On November 11, 2005, the Ione Band submitted to Defendant BIA an application to accept title to 228.04 acres of real property into trust on behalf of the Band for the purpose of "develop[ing] a gaming facility on the property" (i.e., a "fee-to-trust application").

84.     The federal authority to take land into trust is claimed to be Sec. 5 of the IRA. According to Sec. 19 of the IRA, no tribe not recognized before June 1, 1934 is eligible for any of the benefits of the IRA. *See Carcieri v. Salazar, supra*. This Indian Band has no claim to recognition before July 27, 1994 making it ineligible to have any lands placed into federal trust status according to the statute.

85.     On September 19, 2006, Defendant DOI's former Associate Solicitor, Carl Artman, issued a written Opinion determining that the Ione Band is a "restored tribe" and that the Plymouth, CA Parcels tied to the Ione Band's then pending fee-to-trust application would qualify as "restored lands" under IGRA if they were acquired in trust for the benefit of the Ione Band.

86.     On January 3, 2008, Defendant DOI's former Assistant DOI Secretary – Indian Affairs, Carl Artman ("Artman"), issued a Memorandum to BIA Regional Directors entitled, "Guidance on Taking Off-Reservation Land into Trust for Gaming Purposes," which emphasized how the Defendant DOI Secretary possesses broad discretion "whether to take land into trust, either on -reservation or off-reservation."

87.     The Artman January 3, 2008 Guidance Memorandum further stated that, "Section 151.11 of 25 C.F.R. Part 151 sets forth the factors the Department will consider when exercising

this discretionary authority with respect to 'tribal requests for the acquisition of lands in trust status, when the land is located outside of and noncontiguous to the tribe's reservation.'" This Guidance Memorandum did **not** address the status of non-reservation lands acquired "in trust" by a tribe without a reservation, such as the Ione Band.

88.    On May 20, 2008, Artman announced the issuance in the Federal Register of final regulations (Part 292 regulations) for determining whether lands acquired in trust after October 17, 1988 meet the statutory exceptions of IGRA Section 20 (25 U.S.C. § 2719) to IGRA's general prohibition against gaming on such lands. (*See* 98 Fed. Reg. 29354-29380 (May 20, 2008)).

89.    According to the Artman press release, these final IGRA Section 20-implementing regulations added new 25 C.F.R. § 262.26(b) ("the grandfather clause") that went into effect on August 25, 2008, and "join[ed] other tools…[former] Assistant Secretary Artman…ha[d] used such as ordering the review of the Indian Reorganization Act fee-to-trust process (25 CFR Part 151) followed by the Indian Gaming Regulatory Act and issuance of a guidance memorandum on 151(11)(b) for off-reservation acquisitions related to gaming." (*See* 73 Fed. Reg. 35579-35580 (Jun. 24, 2008) (staying, until Aug. 25, 2008, the effective date of May 20, 2008).

90.    The Ione Band's submission in April 2006 of comments in response to proposed IGRA Section 20 regulations likely contributed to DOI's promulgation of new final regulation 25 C.F.R. § 262.26(b). These proposed regulations effectively relied upon the September 19, 2006 Artman Memorandum to exempt the Ione Band's Plymouth City and Amador County parcels from IGRA Section 20's prohibition against gaming on post-October 17, 1988 land acquisitions.

91.    In January 2009, former DOI Solicitor, David Bernhardt, issued a Memorandum concluding that the Artman Memorandum which had concluded the Ione Band was a "restored tribe" under IGRA Section 20 (25 U.S.C. § 2719) "was wrong," and he then withdrew and reversed

that earlier memorandum.

92.    The January 2009 Bernhardt Memorandum found that the Ione Band was **not** a "restored" Indian tribe under IGRA Section 20, because there had been **no** "history" of governmental recognition prior to 1994 as the Artman Memorandum had wrongly concluded, and therefore, **no** "termination" of recognition to be "restored."

93.    The Bernhardt Memorandum specifically noted that the Ione Band's "recognition as an Indian tribe by the Federal government was **not** complete until Assistant Secretary Deer's letter of March 1994 and [its] subsequent inclusion on the Federal Register list of tribal entities." It questionably discounted, however, the fact that "Deer's action [had been] taken outside the Department's regulatory acknowledgement process."

94.    In February 2009, Defendant BIA's Pacific Regional Office issued a Final Environmental Impact Statement ("FEIS") "assess[ing] the environmental consequences of  the [Ione Band's] application to have the BIA take…228.04 acres of land into [Federal] trust and that a casino, event center, hotel and other facilities supporting the casino be constructed on the property…The Final EIS addresse[d] the foreseeable consequences of the Federal actions, including the development and operation of one of four related commercial alternatives."

95.    The February 2009 FEIS described the "project site" as "located partially within the incorporated City of Plymouth (10.28 acres) and unincorporated Amador County (217.76 acres) on 12 parcels totaling approximately 228.04 acres," and as "located immediately adjacent to State Highway 49 two miles north of the junction of State Route 16 (SR 16) and State Route 49 (SR 49). Surrounding land uses consist of grazing land located east and south of the project site and commercial uses located north and west of the project site."

96.    The "Purpose and Need" Section of the February 2009 FEIS stated that, "[t]he

**purpose and need for taking the property into Federal trust**, approval of a Development and Management Contract, and subsequent development is **to carry out the Federal Government's trust responsibilities to the Tribe**…" (emphasis added).

97.    The solicitors and bureaucrats of the Bureau of Indian Affairs have used the Indian trust relationship and their various interpretations of it to completely avoid applying the statutory date requirements of both the IRA and IGRA. No words included in statutes or court opinions have succeeded in limiting the application of the Indian trust relationship by the Department of the Interior.

98.    The February 2009 FEIS set forth "Alternative A" as the "Proposed Alternative." It "consist[ed] of the development of a 120,000+ square foot casino, a 166,500 square foot hotel and a 30,000+ square foot event and convention center. The casino components would include 2,000 slot machines, 40 table games, other back of house areas, and food and beverage areas consisting of a buffet, a specialty restaurant, and a coffee bar and sport's bar."

99.    The February 2009 FEIS indicated that the "socioeconomic conditions" of the Proposed Alternative were such that "[t]aking the site into trust **would remove a tax base** from the City of Plymouth and County of Amador." (emphasis added).

100.    To mitigate this impact, the February 2009 FEIS stated that, "[c]ommencing at the time of the fee-to-trust transfer of the project site, the Tribe **shall** pay an annual contribution equal to the current tax rate to the City of Plymouth and Amador County to address lost property tax revenues. The amount of payment shall be subject to annual review." (emphasis added).

101.    On August 13, 2010, Defendant BIA published in the Federal Register and formally issued its FEIS "for the approval of a 228.04-acre trust acquisition and casino project in the City of Plymouth and unincorporated Amador County, California…**to establish a[n Indian] land**

23

**base**" (emphasis added), pursuant to the National Environmental Policy Act ("NEPA"). (*See* 75 Fed. Reg. 49513 (Aug. 13, 2010)).

102.    On November 23, 2010, former Defendant BIA Director, Defendant Michael S. Black, announced in a News Release that he had appointed Amy L. Dutschke ("Dutschke") as Regional Director of BIA's Pacific Regional Office in Sacramento, California, that she served in this position effective on October 10, 2010, that she is an enrolled member of the Ione Band of Miwok Indians, and that she "was instrumental in the development of the…California Fee to Trust Consortium."

103.    From February 4, 2009, through March 9, 2011, the Ione Band and its lawyers engaged in a letter-writing campaign endeavoring to have the Defendant DOI Office of the Secretary and the former DOI Solicitor, Hilary Tompkins, withdraw the January 2009 Bernhardt Memorandum and reinstate the September 2006 Artman Memorandum.

104.    On May 24, 2012, BIA's former Acting Assistant Secretary of Indian Affairs, Donald E. Laverdure ("Laverdure"), issued a Record of Decision ("ROD") concluding that the Ione Band was eligible, as a federally recognized tribe under federal jurisdiction in 1934, to have Defendant DOI "acquire the 228.04-acre parcel in Amador County, California in trust for the Band **for gaming purposes**." (emphasis added).

105.    The May 24, 2012 ROD referred to the September 2006 Artman Memorandum as "represent[ing] the current policy of the Department," given former DOI Solicitor Tompkins' apparent July 2011 rescission of the 2009 Bernhardt Memorandum that had previously withdrawn the Artman Memorandum.

106.    On May 30, 2012, Defendant BIA published in the Federal Register the May 24, 2012 ROD conclusion that the Ione Band was eligible, as a federally recognized tribe under federal

jurisdiction in 1934, to have DOI accept into federal trust on its behalf said 228.04 acres of land. (*See* 77 Fed. Reg. 31871 (May 30, 2012)).

107.    On May 16, 2016, Defendant BIA issued its final rule on the types of title evidence that would be accepted to support fee-to-trust applications.  These regulations "continue[d] to provide that the Secretary has discretion to require the **elimination of any liens, encumbrances, or infirmities** prior to acceptance in trust." These regulations "also continue[d] the practice of requiring the elimination of any legal claims, including but not limited to liens, mortgages, and taxes, determined by the Secretary to make title unmarketable, prior to acceptance in trust." (emphasis added). (*See* 81 Fed. Reg. 30173, 30174 (May 16, 2016); 25 C.F.R. § 151.13(b)).

108.    On March 6, 2018, the National Indian Gaming Commission ("NIGC") approved an amendment to the gaming ordinance the Ione Band had ostensibly enacted under IGRA and NIGC regulations.

109.    On March 9, 2020, former DOI Solicitor Daniel Jorjani issued a Memorandum to the Interior Secretary (M-37055), withdrawing the prior March 12, 2014 Memorandum Opinion of former Solicitor Hilary Tompkins (M-37029).

110.    The Hilary Tompkins Memorandum M-37029 largely adopted with little change the legal analysis, interpretive framework, and two-part procedure for determining whether a tribe was 'under federal jurisdiction' in 1934, set forth in the December 2010 Cowlitz ROD upon which the May 24, 2012 Ione Band ROD was largely based.

111.    The Jorjani Memorandum of March 9, 2020 concluded that "M-37029's interpretation of Category 1 [was] not consistent with the ordinary meaning, statutory context, legislative history, or contemporary administrative understanding of the phrase 'recognized Indian tribe now under federal jurisdiction.'"

112.    The Jorjani Memorandum also indicated that new procedures would be forthcoming to guide determinations of the eligibility of applicant tribes under the first definition of "Indian" (i.e., "Category 1") set forth in IRA Section 19. "This guidance derives from an interpretation of Category 1 that better reflects Congress' and the Department's understanding in 1934 of the phrase 'recognized Indian tribe now under federal jurisdiction.'"  The Jorjani guidance apparently incorporated the findings of a memorandum he had received only four (4) days earlier, dated March 5, 2020, from several DOI Solicitors, including Defendant Eric Shepard.

113.    On March 20, 2020, Ryan Hunter, the Acting Regional Director of Defendant BIA's Pacific Region located in Sacramento, California, accepted into federal "trust" on behalf of the Ione Band for Indian gaming purposes ten (10) of twelve (12) land parcels located in the City of Plymouth and Amador County owned in fee simple by IMG Plymouth Land Holdings, LLC, controlled by Salvatore Rubino ("Rubino").

114.    Hunter cited as authority for the "Acceptance of Conveyance" Section 203 the Indian Land Consolidation Act ("ILCA"), 25 U.S.C. § 2202. (Ex. 5 at 11). 25 U.S.C. § 2202 provides that the fee-to-trust provisions of IRA Section 5 (25 U.S.C. § 5108) "shall apply to all tribes notwithstanding the provisions of IRA Section 18 (25 U.S.C. § 5125) precluding the IRA from applying to "any reservation wherein a majority of the adult Indians…shall vote against its application."

115.    According to Wikipedia, about 172 Indian tribes adopted the IRA constitutions while 75 Indian tribes that were allowed to vote on it rejected it. It took a two-thirds majority of voters to reject the IRA because all voter abstentions were treated as yes votes. That means there were approximately 242 historically recognized Indian tribes in 1934. Oklahoma and its tribes were not included in the IRA. (*See* Wikipedia, *Indian Reorganization Act*, last visited on April 8,

2025).

116.    Congress, in 1940, threatened to repeal the IRA because they thought that many Indian tribes that had been allowed to vote on the IRA were not historically recognized tribes. This threat stopped the Secretary of Interior and the BIA from continuing to claim the authority to recognize new tribes and bestow the rights of the IRA upon them for about 40 years, until the Presidency of Richard Nixon. (*See* Sen. Rpt. No. , to accompany S.2103, *Repeal of the So-Called Wheeler-Howard Act*, 76th Cong. 1st Sess. (Aug. 2, 1939).

117.    Currently, 574 Indian tribes are listed as recognized and the Secretary claims all of these Indian tribes are eligible for all of the benefits of the IRA, including the Ione Band of Miwok Indians. Hunter, *supra*, acted ostensibly "[p]ursuant to the authority delegated from the Secretary as set forth in 209 DM 8, 230 DM 1, and 3 IAM 4," with the apparent full knowledge and awareness of his immediate superior, Amy Dutschke, the BIA Regional Director. *Id.*

118.    Sec. 2.26 of the California-Ione Band of Miwok Indian Gaming Compact executed in August 2020, provides *inter alia* that "[f]or purposes of th[e] definition [of]…'Significant Effect(s) on the Off-Reservation Environment'… **'reservation' refers to the Tribe's Indian lands within the meaning of IGRA or lands otherwise held in trust for the Tribe by the United States**." (emphasis added). (Ex. 6 at Sec. 2.26). *See also Id*. at Sec. 12.6(c) (using same emphasized language).

119.    On October 6, 2022, an Ione Band press release announced that the Ione Band had "entered into a development agreement with **Warner Gaming** for a new entertainment project in Plymouth, California.   Warner Gaming focuses on the development and management of best-in-class gaming facilities, luxury hotels, restaurants, and recreational facilities."

120.    On March 22, 2023, the NIGC approved additional amendments to the gaming

ordinance that the Ione Band had ostensibly enacted under the IGRA and NIGC regulations.

121.    On December 12, 2023, Defendant BIA issued a final rule updating the 25 CFR Part 151 regulations governing the BIA's acceptance into trust of fee lands under IRA Section 5, which became effective January 11, 2024. (*See* 88 Fed. Reg. 86222 (Dec. 12, 2023)).

122.    The updated 2023 25 C.F.R. Part 151 regulations explain that because the Assistant Secretary's decision to accept fee land into trust "constitutes a final agency action for purposes of the [Administrative Procedure Act] APA[,] Interior is retaining the requirement that if the request will be approved, notice of such approval will be published **in the Federal Register**. Such publication makes clear that a final agency action has occurred." (emphasis added). (*See* 88 Fed. Reg. at Preamble, 86245, 86254; 25 C.F.R. § 151.13(c)(2)(ii)). *Cf.* 25 C.F.R. § 151.13(d) (decision made by BIA official not a final agency action).

123.    The updated Part 151 regulations also explain that 25 C.F.R. § 151.14(b) allows the Secretary to seek additional action, if necessary, to address liens, encumbrances, or infirmities on title…While we expect the Department will need to disapprove if title is so deficient as to be unmarketable, the Secretary retains discretion here. The new rule balances the United States interest in obtaining marketable title with the legal consequence that land held in trust is inalienable." (*See* 88 Fed. Reg. at Preamble, 86229).

124.    The updated Part 151 regulations, in addition, explain that "the Department may accept, in its discretion, some encumbrances on title and, should those encumbrances have the potential to impose costs in the future, the Department may enter into indemnification agreements with the applicant to facilitate the processing of fee-to-trust applications." (*See* 88 Fed. Reg. at Preamble, 86229).

125.    The updated Part 151 regulations, furthermore, explain that, "[u]nder the Checklist

of Solicitor's Office Review of Fee-to-Trust Applications issued by Solicitor Tompkins on January 5, 2017, an indemnification agreement between the BIA and a Tribal applicant to address a responsibility that runs with the land may be appropriate if the Tribal applicant is willing to enter into the indemnification agreement, the risk of liability for the responsibility is low, and the indemnification agreement is the only device that will allow the Department to continue processing the land into trust application." (*See* 88 Fed. Reg. at Preamble, 86229).

126.    In January 2024, the Ione Band released its "Tribal Initial Study/Mitigated Negative Declaration" for the "Ione Plymouth Casino Project."  This Declaration referred to the Ione Band casino development project as a "Reduced Project," and it stated that "[t]he Reduced Project is substantially smaller than Alternative A in the [2009] EIS and includes less than 350 Class III gaming devices."

127.    The January 2024 Tribal Negative Declaration also stated that "[t]he Reduced Project is within the scope of the Gaming Facility identified as the preferred action alternative in the Final EIS (75 Fed. Reg. 49513 (Aug. 13, 2010)) and approved in the associated Record of Decision (77 Fed. Reg. 31871-31873 (May 30, 2012))."

128.    Notably, the January 2024 Tribal Negative Declaration did not commit the Ione Band to make any annual contribution equal to the current tax rate to the City of Plymouth and Amador County "to mitigate" lost property tax revenues as the result of the land parcels being taken into federal "trust," as it committed itself to do in the FEIS and ROD.

129.    On April 4, 2024, Plaintiffs and Amador County were informed in a newspaper article that another parcel of fee land "not contiguous to lands held in trust for the Ione Band" had been taken into trust for the Ione Band on March 21, 2024.  No prior notice of a fee-to-trust application for this parcel from the Ione Band was ever received by Amador County or the City of

Plymouth in complete violation of federal regulations. According to the newspaper article, Notice for this parcel was filed in Fresno County, because "[t]he subject property is identified in Fresno County records as Assessor's Parcel Number 010-160-010-000, containing .88 acres." (Ex. 7).

130.    On August 30, 2024, the Tax Collector of Amador County California published a Legal Notice in the Amador County Ledger Dispatch setting forth a "Property Tax Default (Delinquent) List" of real properties "declared to be in tax default at 12:01 a.m. on July 1, 2021, by operation of law, pursuant to Revenue and Taxation Code Section 3436." (Ex. 8).

131.    The Legal Notice stated that "[t]he declaration of default was due to non-payment of the total amount due for the taxes, assessments, and other charges **levied for the fiscal year 2020-2021 that were a lien on the listed real properties**." It further stated that "[t]he total amount to redeem (**Redemption Amount**), including all penalties and fees, **as of September 30, 2024**, is shown below opposite the assessment Number and next to the name(s) of the Assessee(s)." (emphasis added). (Ex. 8).

132.    Seven (7) of the ten (10) parcels the BIA Pacific Region Regional Director, Amy Dutschke had accepted into federal trust for the Ione Band were included on said Property Tax Default Delinquent List bearing a total Redemption Amount, as of September 30, 2024, of $41,927.25. (Ex. 8).

133.    On October 17, 2024, Ryan Hunter, the Acting Regional Director of BIA's Pacific Region located in Sacramento, California, accepted into federal trust on behalf of the Ione Band, pursuant to IRA Section 5, from Ione Band Chairperson Sara A. Dutschke, the grant of two (2) land parcels located in Amador County and Plymouth, California ostensibly owned in fee simple by the Ione Band. (Ex. 9).

134.    Hunter accepted these two (2) fee parcels into federal trust "in accordance with the

authority delegated to the Assistant Secretary – Indian Affairs by 209 DM 8; to the Director, Bureau of Indian Affairs by 230 DM 1, to the Deputy Bureau Director, Field Operations and BIA Regional Directors by 3 IAM 4," with the apparent full knowledge and awareness of Amy Dutschke, who served as the actual BIA Pacific Regional Director.

135.    On November 6, 2024, Tribal Gaming and Hospitality Magazine reported the Ione Band of Miwok Indians' announcement that they had finally "closed a $110,000,000 [million] delayed draw term loan facility (Loan) solely sourced from Gaming and Leisure Properties, Inc. (GLPI), a $13.8 billion real estate investment trust (REIT) focused on the gaming industry. The Tribe has an option at the end of the Loan term to satisfy the remaining Loan obligation owed to GLPI by converting the outstanding principal into a long-term lease from GLPI with an initial term of 25 years and a maximum term of 45 years." (TG&H Magazine 11/6/2024).

136.    The November 6, 2024 TG&H Magazine article quoted Ione Tribal Chairperson Sara Dutschke, as saying that "'[t]his transaction represents the first time that a REIT has provided both project financing and/or a long-term lease option to a Tribe for purposes of direct investment in a gaming asset on Tribal trust lands." (TG&H Magazine 11/6/2024).

137.    Upon information and belief, it has been reported that Ione Tribal Chairperson Sara Dutschke  is "related" by family to Amy Dutschke, current Regional Director of Defendant BIA's Pacific Regional Office, who is her aunt.

138.    By January 2, 2025, photographs taken by Plaintiffs revealed that Ione Band contractors had already installed silt fencing around the perimeter of the proposed casino construction site, and were preparing to take further development activities at the site.

139.    By March 14, 2025, photographs taken by Plaintiff revealed that Ione Band contractors were continuing their earthmoving activities at the site.

140.    The various memoranda cited above demonstrate how the Indian trust relationship interpreted with the Nixon Indian policy of promoting tribal sovereignty has been used to completely evade the specific limitation Congress placed in Section 19 of the IRA and the date limitation in IGRA.

141.    Congress in IRA Section 19, placed the limitation that only historically recognized Indian tribes now under federal jurisdiction as of June 1, 1934, were the only tribes eligible to use the benefits of the IRA. The majority ruling in *Carcieri v. Salazar*, *supra*, determined that Section 19 was not ambiguous.

142.    Section 5 of the IRA allows the Secretary of the Interior to acquire lands for Indians. The majority opinion in *Carcieri* should have stopped the manipulations of the USDOJ and DOI to apply Section 5 and fee to trust to all recognized Indian tribes.

## FIRST CLAIM FOR RELIEF

### VIOLATION OF FEDERAL RECOGNITION TRIBAL LIST ACT

143.    Plaintiffs reallege and incorporate by reference paragraphs 1-142 of this Complaint as though fully set forth herein.

144.    "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" 42 U.S.C. § 1983.

145.    "This statute, enacted to aid in ''the preservation of human liberty and human rights,''…reflects a congressional judgment that a 'damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees. As remedial

legislation, § 1983 is to be construed generously to further its primary purpose.'" *Gomez v. Toledo*, 446 U.S. 635, 638-639 (1980) (citations omitted).

146.    The only legal authority delegated to the Department of the Interior to recognize an Indian tribe not already historically recognized at the adoption of the IRA on June 18, 1934 is as directed by Congress in the Federal Recognition Tribal List Act and its Part 83 regulations.

147.    As detailed in previous paragraphs, neither Ada Deer, Carl Artman nor any other federal defendant had or has any statutory authority to recognize the Ione Band of Miwok Indians without the Band completing the Part 83 process.

148.    The original bill submitted to pass the IRA in 1933 contained many special provisions for Indians and Indian tribes. Many hearings were held over the proposed bill. The House passed the very expansive bill but the Senate rejected it. A full bill substitute containing smaller changes was adopted and then enacted into federal law as the IRA on June 18, 1934.

149.    Only historically recognized tribes that voted for the adoption of the IRA were supposed to gain the benefits of its new provisions. Defendant Bureau of Indian Affairs (BIA) was required to produce actual lists of the Indian tribes that would be allowed to vote on the IRA. Indians of half-blood or more were also given specific benefits under the IRA even if their tribes were not federally recognized.

150.    The voting on the IRA created an administrative maelstrom with the BIA trying to find ways to expand the definition of "recognized Indian tribe" to even include Indian colonies in California with only one to three Indians present that never spoke to each other and were from different Indian groups being called an "Indian tribe." *See generally United States v. McGowan*, 302 U.S. 535 (1938).

151.    Only tribes that were historically recognized and accepted the IRA by their votes

were supposed to gain the new benefits of the IRA which included becoming formally federally recognized and being allowed to acquire additional lands.

152.    While the separate bands of large Indian tribes like the Sioux were recognized as separate but related Indian tribes with their own governmental authority and customs, the small bands of Indians in California did not meet any of the criteria to make them historical "tribes."

153.    Not only were these groups only part Indian having intermixed with the Mexican people who consider themselves "Mestizos" or mixed blood, many were Indians from tribes that had been rendered extinct in Mexico and had no connection to the United States.

154.    These small itinerant bands wandered most of the state. Many Mestizos had become the servants and workers that accompanied the land grant families. Some of these Mestizos intermarried with the wandering Indians.

155.    The Ione Band of Miwok Indians was literally the servants and workers that remained on the Pico land grant, as explained above. This small group of three families cannot meet the requirements to be recognized under 25 C.F.R. Part 83.

156.    The actions of Ada Deer and Carl Artman to "recognize" the Ione Band using the Federal Indian trust relationship as interpreted by the Nixon federal Indian policy of promoting tribal sovereignty were deliberately done to expressly evade the congressional intent to limit the application of the IRA to only those tribes that appeared on at least one of the lists of Indian tribes historically recognized on June 1, 1934.

157.    The interpretation of the Indian trust relationship was expanded by Congress with the passage of the IRA in 1934 with the addition of the specific benefits in the act. Congress did not delegate any authority to the USDOJ or USDOI to expand the Indian trust relationship beyond what was expressly adopted by statute.

158.    In 1970, the new Nixon Indian policy of "promoting tribal sovereignty" was sent to Congress. From 1970 on, the combination of using the promotion of tribal sovereignty as the interpretational lens through which to view and construe the federal Indian trust relationship has created claims of unlimited federal power in the USDOI, USDOJ and sometimes other agencies, when they are acting on behalf of an Indian tribe or an individual Indian.

159.    The Nixon Indian policy is an extension of the 1871 Indian policy, *infra,* and has been wrongfully applied to the IRA.

160.    President Nixon deliberately and knowingly reached for this unlimited power that was originally used against the American colonists by King George III in his Proclamation of 1763 to overcome any limitations on Executive power.

161.    Congress provided for acquiring some land in California, starting with the Mission Indian Relief Act of 1891, Ch.26 Stat. 212 (Jan. 12, 1891), to attempt to stop the numerous small groups of "Indians" from wandering all over the state.  Numerous federal welfare acts were passed between 1891 and 1940 to stop the Indians/Mestizos from wandering and squatting on unauthorized lands.

162.    According to a list of documents identified in a letter sent to R. Lee Fleming of Defendant BIA's Office of Federal Acknowledgment by National Indian Gaming Commission Staff Attorney Andrea Lord dated January 10, 2016, an attempt was made by the United States to purchase 40 acres for the Ione Band in Amador County in 1916. The letter, however, does not specify which Indian welfare act was used to attempt to make this purchase. The United States did not purchase the 40 acres and informed John Oliver in another correspondence dated February 18, 1917, that the purchase would not be made. No other contact is reported until the 1990's. (Ex. 10 at 1-2).

163.    As the Artman Memorandum on p.2, the Bruce Letter on p.2, and the NIGC letter to Fleming strongly suggest, the attempted land purchase in 1917 for these Mexican servants was enough to allow them to be considered "Indians under federal jurisdiction" in 1934 per section 19 of the IRA.  The 1917 correspondence for the attempted land purchase was with two specific individuals and no reference was made about the group being a band, colony or tribe. This group had no relations internally that could be classified as "governmental" or organized or "Indians."

164.    These documents provide the only explanation of Ada Deer's claimed authority in 1994 to "recognize" the Ione Band and place them on the list of tribes eligible to receive federal benefits.

165.    This information does explain the fight between the 2006 Artman Memorandum and the 2009 Bernhardt Memorandum and subsequent memoranda. The small contact in 1916-1917 between two individuals and the United States is not what Congress intended to create historical tribal recognition under the IRA. This took an extreme interpretation of "now under federal jurisdiction" that Bernhardt thought went too far.

166.    Alternatively, the Defendant BIA and the Laverdure letter create a different argument, based on the same unlimited Indian trust position, that relies upon Artman's interpretation of the meaning of 25 U.S.C. §§ 2719(a) and 2719(b)(1)(B)(iii), to unlawfully infer that the 1972 Commissioner Bruce letter "amounted to recognition for the Tribe in accordance with the practices of the Department at the time," even though such "recognition" occurred entirely outside the required statutory and regulatory process. This is the position adopted in the May 24, 2012 ROD.

167.    More specifically, Defendant BIA and Laverdure, based on the Indian trust, unlawfully reached the May 24, 2012 ROD conclusion by relying upon Artman's unlawful

manipulation of the meaning of 25 U.S.C. §§ 2719(a) and 2719(b)(1)(B)(iii) to infer that that "[t]he positions subsequently taken by the Department in Federal court and before the IBIA against the Tribe were wholly inconsistent with that position, and as such manifest[ed] a termination of the recognized relationship."

168. More specifically, Defendant BIA and Laverdure, based on the Indian trust, unlawfully reached the May 24, 2012 ROD conclusion by relying upon Artman's unlawful manipulation of the meaning of 25 U.S.C. §§ 2719(a) and 2719(b)(1)(B)(iii), to infer that "Assistant Secretary Deer's [1994] review of the matter and reaffirmation of Commissioner Bruce's position amounts to a restoration of the Tribe's status as a recognized Tribe."

169. More specifically, Defendant BIA and Laverdure, based on the Indian trust, finally, unlawfully reached the May 24, 2012 ROD conclusion by relying upon Artman's unlawful manipulation of the meaning of 25 U.S.C. §§ 2719(a) and 2719(b)(1)(B)(iii), to infer that "the Department had previously determined that the proposed acquisition would constitute restored lands for a restored [Tribe] within the meaning of the IGRA," because "[t]he Department's 2006 determination…found that the land being acquired is in an area that is historically significant to the Tribe."

170. The administrative maelstrom created by the IRA was made even worse when the United States Department of Justice ("USDOJ") commissioned the writing of the Federal Handbook of Indian Law. This piece of legal propaganda contains major alterations of the historical record based on the federal Indian trust relationship. The new Handbook claimed that the federal government had always protected the Indian tribes under the trust relationship discussed in *Worcester v. Georgia*, *supra*.

171. The truth is that no President from Andrew Jackson to Abraham Lincoln enforced Chief Justice Marshall's opinion in *Worcester v. Georgia* that, according to the federal handbook, created the special Indian trust. Chief Justice Marshall went to jurisdictional extremes to remove the case from the state courts in Georgia to make a ruling in Indian law that could be used later to legally preserve slavery. The slavery ruling that used the *Worcester* trust argument without ever citing it was the infamous *Dred Scott v. Sandford*, 60 U.S. 393 (1857).

172. The Indian canons of statutory construction were first applied in *Worcester*. After 1934, these canons were expanded by the federal courts as USDOJ used the new Handbook to alter the historical record and to misrepresent to the courts that no harm would come to the majority of Americans from favoring the Indian trust relationship.

173. The USDOJ, in its enabling legislation, was given the authority to define and use the war powers of the naval judge advocate general and solicitor of the War Department as general war powers. (*See* 16 Stat. 162, Ch. 150 Secs. 3, 6 (June 22, 1870)).

174. The USDOJ was created by former Secretary of War Edwin Stanton in 1870 to preserve the federal claim of territorial sovereignty over the Indians and to complete the punishment of the Rebel states. These territorial powers in the United States had been accepted by the Supreme Court to preserve slavery. These were the very territorial war powers used by George III from the Discovery Doctrine of the Pope and exercised in his Proclamation of 1763 that the Founders of our nation were subjected to until they decided to fight for independence from Great Britain.

175. With the recent U.S. Supreme Court decisions having fundamentally changed the Indian trust relationship, the Indian canons of statutory construction are being rejected. The federal Indian policy of promoting tribal sovereignty causes harm to all persons not accorded the special

status by displacing the structural, due process and equal protection limitations the Constitution imposes on the federal government.

176.    The U.S. Supreme Court, in *Haaland v. Brackeen*, 143 S.Ct. 1609 (2023), emphasized that "Congress's Indian affairs power 'is **not absolute'**…Article I gives Congress a series of enumerated powers, not a series of blank checks…Congress's authority to legislate with respect to Indians is **not unbounded**. It is plenary within its sphere, but even a sizeable sphere has borders." (emphasis added). *Brackeen*, 143 S.Ct at 1629.

177.    Thus, the *Brackeen* majority and the Alito dissent jointly held that "'even [Congress's] "so-called plenary powers" over Indian affairs '"**cannot override foundational constitutional constraints**.'" (emphasis added). *Brackeen*, 143 S.Ct at 1629,n.3 (quoting Alito, J. dissent.), 143 S.Ct. at 1685.

178.    In *Arizona v. Navajo Nation*, 143 S.Ct. 1804 (2023), the U.S. Supreme Court revealed that "the United States maintains [only] a **general trust relationship** with Indian tribes." (emphasis added). *Navajo Nation*, 143 S.Ct. at 1814. Accord *Hill v. United States*, No. 22-1781 (D.D.C. Oct. 19, 2023), slip op. at 28.

179.    In addition, in *Navajo Nation*, the Supreme Court held that, "unless Congress has created a conventional trust relationship with a tribe as to a particular trust asset, th[e] Court will not 'apply common law trust principles' to infer duties not found in the text of a treaty, statute, or regulation." *Id*.

180.    In *Navajo Nation*, the Supreme Court also reaffirmed that "'Congress may style its relations with Indians a trust **without assuming all the fiduciary duties of a private trustee**, creating a trust relationship that is limited or bare compared to a trust relationship between private parties at common law.'" (emphasis added). *Navajo Nation*, 143 S.Ct. at 1814 (quoting *United*

*States v. Jicarilla Apache Nation*, 564 U.S. 162, 174 (2011)). Accord *Hill*, slip op. at 28 (quoting

*Navajo Nation*, 599 U.S. at 566)*,* (quoting *Jicarilla Apache Nation*, 546 U.S. at 174)).

181.    "The Fourteenth Amendment is a part of the Constitution generally designed to

allocate governing authority among the Branches of the Federal Government and between that

Government and the States, and to secure certain individual rights **against both State and Federal**

**Government**." (emphasis added). *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

182.    The Ione Band is not on any of the four lists of historically recognized Indian tribes

composed by the BIA after the adoption of the IRA. These lists were disclosed to the Supreme

Court of the United States in *Carcieri v. Salazar, supra*. The majority opinion attempted to restore

the intent of Congress to the application of the IRA.

183.    After the ruling in *Carcieri*, the BIA and USDOJ used the "special Indian trust

relationship" and Indian policy of promoting tribal sovereignty in numerous M opinions and

actions, as cited above, to evade enforcing the *Carcieri* ruling. These actions do not change what

the Supreme Court has opined in defining Section 19 of the IRA.

184.    Therefore, the only way the Ione Band of Miwok Indians could be federally

recognized is through the 25 C.F.R. Part 83 process. The Ione Band has never even made an

application under Part 83. Allowing the Ione Band to be "recognized" by Ada Deer without any

further process being required demonstrates the absurdity and unlimited power to reclassify the

status and rights of persons claimed by Federal and Individual Defendants in the name of the Indian

trust relationship.

185.    Plaintiffs have been damaged by the actions of Federal and Individual Defendants

and their predecessors in wrongfully "federally recognizing" the Ione Band of Miwok Indians in

violation of 42 U.S.C. § 1981, which requires all governments to treat people like "white people."

The reason for this very blunt provision of the 1866 Civil Rights Act was to prevent exactly what has happened here--to prevent Federal and Individual Defendants from being able to create different statuses of citizens of the United States.

186.    Allowing the Secretary of the Interior to arbitrarily recognize the Ione Band as an Indian tribe without following any law unconstitutionally creates a separate federally entitled class of citizens that are privileged to remove all state and local jurisdictional compliance in violation of 42 U.S.C. § 1981 as enforced through 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF

### THE IONE BAND IS NOT ELIGIBLE UNDER THE INDIAN REORGANIZATION ACT AND/OR THE INDIAN LAND CONSOLIDATION ACT TO ACQUIRE LAND

187.    Plaintiffs reallege and incorporate by reference paragraphs 1-186 of this Complaint as though fully set forth herein.

188.    Defendant BIA and Laverdure, based on the Indian trust, unlawfully reached the May 24, 2012 ROD conclusion that the Ione Band was eligible, as a "federally recognized tribe" under federal jurisdiction in 1934, to have the Secretary "acquire 228.04 acres of land into trust for" its benefit under Section 5 of the IRA (25 U.S.C. § 5108) and its implementing regulations under 25 C.F.R. §§ 151.3(a)(3) and 151.10(a)(1).

189.    As noted above, the actual deeds of trust cite ILCA Sec. 203 (25 U.S.C. §2202) as the authority to accept the first 10 parcels of land into federal trust.

190.    By adopting 25 U.S.C. § 2202, Congress had effectively repealed 25 U.S.C. §5125 exempting from the IRA's application those Indian tribes that were deemed eligible as historically recognized to vote on the IRA and had rejected it. 25 U.S.C. § 2202 does not purport to alter in any way the congressional intent of confining the application of the IRA in Section 19 to only

those Indians tribes that were historically treated as tribes and were under federal jurisdiction as of June 18, 1934.

191.    It is a brazen lie for USDOJ, DOI and BIA to claim that in repealing 25 U.S.C. § 5125 Congress somehow delegated the authority to the Secretary of the Interior and BIA to bestow all currently federally recognized tribes with all the benefits of the IRA, including via the Section 5 fee-to-trust provision.

192.    Congress itself does not have unlimited Indian trust authority and certainly could not and has not in any statute attempted to delegate open-ended authority to the Secretary of the Interior or the BIA to apply the IRA to Indian tribes that were not historically federally recognized in June 1934.

193.    Section 19 of the IRA is not ambiguous or unclear. There was and is no misunderstanding of the congressional intent of Section 19.

194.    There is no authority in the IRA for the Secretary or Sacramento Regional Office of the BIA to have accepted these lands into trust status for the Ione Band of Miwok Indians who were not recognized in any tribal capacity until the Ada Deer letter in 1992.

195.    As noted above, an agent of the United States did look into purchasing under one of the Indian welfare acts the 40 acres upon which these Mexican servants who may or may not be American Indians resided on the Pico land grant.

196.    In 1972, California Indian Legal Services, Inc. filed suit in state court to quiet title to the 40 acres against the land grant owner to apply Indian occupancy under the Mexican Secularization Act of 1833 to vest title to the 40 acres in 12 individually named persons. The title was granted to the twelve individuals. In 1972, this group which is now claimed to be the Ione Band of Miwok Indians was not an Indian tribe and the land was not taken into federal trust.

197.    California Indian Legal Services, Inc. is part of much larger private, nonprofit, federally funded corporation known as the Legal Services Corporation which was established by Congress in 1974 in the District of Columbia to provide federal legal aid.  However, it is **not** part of the Department of the Interior. (*See* P.L. 93-355, Title X, 88 Stat. 378 (July 25, 1974)).

198.     None of the facts regarding the quieting of title to the 40 acres are mentioned in any of the federal memoranda written over the status of the Ione Band.

199.    The 2006 Artman Memorandum was withdrawn by the 2009 Bernhardt Memorandum which, in turn, has been replaced by the 2020 Jorjani Memorandum which Plaintiffs assume is still in effect. For purposes of deciding whether or not these 12 parcels of land could be taken into trust status pursuant to Section 5 of the IRA, 25 U.S.C. § 5108, only the Jorjani Memorandum applies.

200.    The Jorjani Memorandum makes clear on page 2 in the second full paragraph that its analysis is based on the Nixon Indian Policy "promotion" of tribal sovereignty, wherein it emphasizes "the importance of trust land acquisitions as a resource for promoting tribal economic and political self-determination."

201.    The Nixon Indian policy of promoting tribal sovereignty that began in 1970 is the interpretational lens through which the Jorjani Memorandum viewed and construed the Indian trust relationship. Not surprisingly, the Jorjani Memorandum based its positions on finding that the phrases "federally recognized" and "now under federal jurisdiction" are totally ambiguous.   It completely rejects the IRA Section 19 interpretation of the majority opinion in *Carcieri* concluding that both these phrases have clear meanings.

202.    Like the actual situation in *Carcieri* where the majority determined that the Narragansett Tribe was actually under state, not federal, jurisdiction in 1934, the individuals that

remained on the 40 acres of the Pico land grant remained under California, not federal jurisdiction.

203.    The State of California became the successor-in-interest to Mexico under the Mexican Secularization Act of 1833. That is why the quiet title case for the 40 acres was brought in state court. The Jorjani Memorandum never discussed that the California Indians were under the primary jurisdiction of the State of California.

204.    The State of California represented all of the California Indians before the Indian Claims Commission, (*See* Indian Claims Act of 1946, Ch. 959, 60 Stat. 1049 (Aug. 13, 1946)), and received one huge judgment that was distributed to all the California Indians by the State.

205.    Even though California is not an original State, California as the successor-in-interest to the Mexican Secularization Act of 1833, like the original States, had primary jurisdiction over all the Indians and Indian tribes within her sovereign boundaries.

206.    The United States is claiming the territorial war powers of the Discovery Doctrine, like those British King George III exercised in his Proclamation of 1763, in an attempt to defeat the concurrent jurisdiction of all of the States to have complete control over their respective Indian "wards" and all their property.

207.    The Jorjani Memorandum is full of deliberate untruths. Four lists of Indian tribes under federal jurisdiction did exist and all were produced in the *Carcieri* case before the Supreme Court. Three lists using different criteria were cited by the Citizens Equal Rights Foundation, the sister corporation to CERA, in their *amicus* brief and a fourth was found by USDOJ and disclosed in the reply brief. At the time of the voting on the IRA, appearing on any one of the lists entitled the Indian tribe to vote. The list categories were defined by what the federal government had done for Indian tribes that possessed some governmental structure that allowed them to raise their issues and negotiate with the United States. The United States had made reservations, given treaty rights,

passed legislation and/or taken executive action for them. The larger more known tribes appeared on more than one list.

208.    The Jorjani Memorandum also attempts to again conflate the original IRA bills that were rejected with the very reduced full bill substitute IRA that was adopted and enacted into law.

209.    Even the BIA solicitors became nervous over these lies because, on December 1, 2020, the Solicitor's Office issued a more accurate rendition of the facts concerning how the IRA was applied in California for the Twenty-Nine Palms reservation. This later memorandum clarifies that the Jorjani Memorandum of March 9, 2020 was primarily written to revise the Tompkins M-30729 Opinion and modify the Category 1 (first definition of "Indian") application to require the existence of some tribal government capable of having a sovereign-to-sovereign relationship with the United States as the proper definition of Section 19 of the IRA, in opposition to the *Carcieri* majority opinion.

210.    As noted above, there was no joint cooperation or any kind of organization on the 40 acres that could in any way be classified as being a "government" for the individuals residing on the 40 acres in 1992.

211.    After Ada Deer, without any legal authority, "recognized" the Villa faction of the Ione Band, another faction (the Burris faction) of the residents on the 40 acres filed suit before Judge Karlton resulting in the opinion that they had not been recognized, as stated above. That suit proves that there was **no** Ione Band of Miwok "sovereign government" of any kind through 1996.

212.    Section 19 of the IRA requires an Indian tribe to have been "federally recognized and now under federal jurisdiction" on June 1, 1934, to be eligible for the Section 5 fee-to-trust benefit of the IRA.

213.    The facts reveal that the Ione band was neither "federally recognized" nor "now

under federal jurisdiction on June 1, 1934."

214.    The 13 parcels of land were erroneously accepted into trust status pursuant to 25 U.S.C. § 5108 and should be ordered returned in fee to the prior owner.

215.    Another untruthful argument the USDOJ and BIA have advanced in attempting to justify their recognition and acceptance of the parcels of fee land into federal trust for the Ione Band, is made in the 1972 Bruce letter, which is supposedly based on the Indian Nonintercourse Acts codified in 25 U.S.C. § 177 as later applied in New York in *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226 (1985). *See County of Oneida*, 470 U.S. at 234 (citing *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667 (1974) ("The 'doctrine of discovery' provided, however, that discovering nations held fee title to these lands, subject to the Indians' right of occupancy and use. As a consequence, no one could purchase Indian land or otherwise terminate aboriginal title without the consent of the sovereign"). *See also County of Oneida*, 470 U.S. at 240 (quoting *Oneida Indian Nation,* 414 U.S. at 678 ("We recognized in *Oneida I* that the Nonintercourse Acts simply put in statutory form what was or came to be the accepted rule – that the extinguishment of Indian title required the consent of the United States").

216.    New York had set aside actual state land Indian reservations for those Indians that chose to stay in New York after the application of the federal Indian Removal Act of 1830. The Indians that remained in New York agreed to be under state jurisdiction. After the passage of the IRA in 1934, the DOI and USDOJ began asserting jurisdiction over the New York Indians.

217.    The BIA used some very creative lawyering to allow the New York tribes to vote on whether to accept the IRA. Most of the New York tribes rejected the IRA, including all of the tribes of the Iroquois Confederacy. Over time, the USDOJ became more aggressive and filed the New York land claim cases against actual individual private property owners in New York,

claiming that New York had not properly extinguished Indian title to thousands of acres of land because they had not gotten federal approval for the treaties they had made with their Indian tribes. These claims were all based on 25 U.S.C. § 177 preventing any alienation of Indian lands--even those lands owned by the State-without federal approval.

218.     New York through its Attorney General, represented all of its landowners against the United States' efforts to upset individual titles to fee property. New York as an original colony never had any federal public domain lands or federal territory.

219.     The United States in the land claim cases with every round of pleadings broadened their claims of their special Indian trust relationship asserting more and more federal authority over the Indians as their special "wards" against New York. After more than 30 years of this litigation, the United States realized that they could not win with just the Indian trust relationship.

220.     The Secretary of the Interior and USDOJ actually allowed the New York tribes to buy fee lands within the land claim areas asserted to have not been properly alienated with permission of the United States under 25 U.S.C. § 177, and they began accepting these lands into federal trust status including restrictions on alienation without going through any process under Section 5 of the IRA.

221.     The United States claimed it could unify the fee title with the claimed remaining Indian title as part of its special Indian "trust" authority and create federal Indian "territory" to fully restore tribal sovereignty in an original State that had never had any federal territorial public domain land.

222.     This "unification theory" of title was rejected by the United States Supreme Court in *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005). But Justice Ginsburg allowed the New York tribes to use the IRA Section 5 process in her majority opinion, not realizing that Section

5 is based on the exact same "unification theory" she had just rejected.

223.    There was no briefing on Section 5 of the IRA in *City of Sherrill*, because the United States had claimed their authority for the "unification theory" came primarily from their power to restrict the sale of all Indian lands under 25 U.S.C. § 177. This claimed authority is a territorial war power from the Pope's Doctrine of Discovery which King George, III previously exercised through the Proclamation of 1763.

224.    The reason Plaintiffs bring up this New York situation is because the legal authority of the Secretary of the Interior to accept fee lands into trust per Section 5 of the IRA is the rejected "unification theory."

225.    In 1998, a group of California tribes frustrated by the federal government's handling of applications to place fee lands into federal trust began to work with Defendant BIA to streamline the fee-to-trust application process.

226.    In 2000, these and other California-based tribes launched a proactive effort known as the California Fee to Trust Consortium ("the Consortium") to overcome the perceived 20-year land-into-trust deadlock.    This program focuses on expeditious processing of fee-to-trust applications, and it is said to support BIA's "[s]trategic goal to fulfill Indian Fiduciary Trust Responsibilities by providing assistance to Tribal and Individual Indians for the purpose of bringing land into trust."

227.    The Consortium "handled requests based on location. On-reservation acquisitions may be delegated to the Superintendent level and can be processed by staff at the agency level. Off-reservation [acquisitions] **are processed in the regional office**," i.e., the BIA Sacramento Regional Office. (emphasis added).

228.    In fulfilling the objective of the Consortium, the BIA Sacramento Regional Office

used the "unification theory" even after the U.S. Supreme Court later rejected it in *Sherrill*. The Consortium claims the same authority asserted by the United States in New York to process fee-to-trust requests from Indian tribes by employees that actually work for the Indian tribes making the fee-to-trust applications. Only the tribes that pay the salaries and expenses of the consortium are eligible to use the consortium to speed up their fee-to-trust applications. The Consortium employees are **not** federal employees.

229. Defendant DOI's Inspector General issued a report, dated September 2006, in which it found that the Consortium created a real conflict of interest by approving fee-to-trust applications without evaluating them pursuant to the standards set forth in the fee-to-trust 25 C.F.R. Part 151 regulations.

230. Federal and Individual Defendants argue that IRA Section 5, 25 U.S.C. § 5108, evidences a congressionally delegated authority to accept fee lands into federal trust status which renders those lands "Indian country" under 18 U.S.C. § 1151, and thereby, removes them from state regulatory and taxing jurisdiction.

231. Assuming that 25 U.S.C. § 5108 contains a legal delegation of Congress' authority under the Property/Territory Clause that allows the United States to convert fee lands that have been under state jurisdiction as private property back into federal territorial status, the Sacramento Regional Office of the BIA is required to apply that delegation of power as Congress intended. At a minimum, it is required to comply with the regulations that define the process in the code of federal regulations. The IRA Section 5 regulations are contained in Part 151.

232. The Consortium's failure to process the acceptance of all of 13 parcels in accordance with the BIA Part 151 regulations directly violated Plaintiffs' rights to due process and process and equal protection of law under the 5th and 14th Amendments.

233.    The deeds to the 13 parcels supposedly taken into federal trust do **not** contain any language restricting them from alienation. Pursuant to 25 U.S.C. § 412a, these parcels are still taxable by Amador County and they arguably remain under California state jurisdiction. The construction for the casino has already begun on the parcels.

234.    The Amador County Tax Collector gave public legal notice issued on August 30, 2024, listing seven (7) of the ten (10) parcels that the Sacramento Regional Office previously accepted into federal trust for the Ione Band on March 20, 2020, as "tax delinquent" "**as of July 1, 2021**" (emphasis added), in the amount of approximately $42,000.

235.    The Sacramento Regional Office of the BIA unlawfully took 7 parcels into federal trust with back property taxes owing, and it **failed** to notify the Ione Band or the previous landowner (Rubino) to ensure the elimination of such liens or encumbrances before accepting the parcels into trust. At a minimum, federal regulations require an indemnification agreement from the Ione Band or previous landowner to the United States before any lands with liens or encumbrances may be accepted into trust status.  No indemnification agreement exists between the Ione Band or previous landowner and the United States.  *See* 25 C.F.R. § 151.14(b) (2023); 88 Fed. Reg. at 86229 (Preamble).[3]

236.    As of the filing of this Complaint, these delinquent property taxes are still owed to Amador County.

237.    Plaintiffs and Amador County were informed in a newspaper article that another parcel of fee land had been taken into trust for the Ione Band. No notice of a fee-to-trust application for this parcel from the Ione Band was ever received by Amador County or the City of Plymouth

---

[3] *See also* U.S. Department of the Interior Bureau of Indian Affairs, *Indian Affairs Fee-to-Trust Acquisitions and Reservation Proclamation s Handbook*, 52 IAM 12-H (Jan. 15, 2025), at 8, 18.

in complete violation of federal regulations.

238.    Notice for this parcel was filed in Fresno County according to the newspaper article. This parcel was also unlawfully accepted into federal trust by the Sacramento Regional Office of the BIA.

239.    Federal and Individual Defendants used the Indian trust and the federal policy of promoting tribal sovereignty to deprive Plaintiffs of adequate and meaningful procedural due process of law **before and after** they accepted the 12 parcels totaling approximately 228 acres of fee lands otherwise subject to state and local taxation into federal trust for the Ione Band, first, on March 20, 2020, and then, on October 17, 2024,  and lastly, the thirteenth parcel noticed in Fresno County on March 21, 2024, without the Ione Band having provided the County, the City, Plaintiffs with the proper updated notice that each acceptance of fee lands into federal trust required, respectively, under 25 U.S.C. §5108 and 25 C.F.R. § 151.11(d) (2011) and 25 C.F.R. § 151.13(c) (2023).

240.    The Sacramento Regional Office of the BIA has flagrantly ignored the specific regulatory requirements of the fee-to-trust process specified above to accept at least eight (8) of the 13 total parcels of land taken into trust status for the Ione Band.

241.    The Sacramento Regional Office is not authorized under the fee to trust regulations to process any applications for trust lands **intended for gaming**. *See* 52 IAM 12, 1.5A ("Assistant Secretary – Indian Affairs (**AS-IA**) is responsible for issuing decisions on **gaming** fee-to-trust acquisitions."); 52 IAM 12, 1.5F ("**RD**s are responsible for complying with IA and Departmental policy and procedures for fee-to-trust acquisitions;…[and] issuing decisions for **non-gaming** fee-to-trust acquisitions…"). (emphasis added).

242.    Any one of the above facts would be sufficient under the Administrative Procedure

Act to show that the Department of the Interior and the Sacramento Regional Office of the BIA has acted arbitrarily, capriciously and not in accordance with law, by taking any lands into federal trust status for the residents of the 40 acres of the Pico land grant. This is especially true for the 8 parcels where actual regulations were violated to take the lands into trust.

243.    This flagrant misuse and abuse of the fee-to-trust process by the Sacramento Regional Office is particularly tainted by the fact that the Regional Director, Amy Dutschke, is a member of the Ione Band and has a direct pecuniary and personal interest in having these parcels of land placed into trust status in order to build a casino that will only directly benefit the members of the Ione Band and burden all other residents of the City of Plymouth and Amador County.

244.    The actions of the Sacramento Regional Office of the BIA are and were under Amy Dutschke's direct control.  Even if she claims to have distanced herself from the actual fee-to-trust decision-making, the Regional Director is still the highest position in the regional office and controls job performance reviews and promotion decisions over all the employees, tainting the entire fee-to-trust process for the Ione Band.  This posed a direct conflict of interest from which the Secretary and Assistant Secretary over the BIA should have disqualified the Sacramento Regional Office so that it did not process these fee-to-trust applications of the Ione Band.

245.    The whole Indian trust relationship is based on claimed blood ties of a group being specially treated by the United States. The justification for this has been the legal fiction that these native groups were politically protected because of their "sovereignty" by the United States.

246.    Through 1996, the group of residents occupying the 40 acres from the Pico land grant, as explained above, had no sort of anything that could be called a "government," and therefore, could not qualify to be any sort of "sovereign" or "political" entity eligible for the benefits of the IRA, including its Section 5, fee-to-trust, benefit.

247.    This group that is being called the Ione Band of Miwok Indians in 1972 were then and are still today full citizens of the United States and of California.

248.    To take lands into federal trust status for this group of individuals that were under state jurisdiction by having been able to quiet title to the 40 acres of the Pico land grant in 1972, stretches the Indian trust relationship to the breaking point. Given the facts, with the right political or administrative connections, any distinguishable group can be made by the DOI and BIA into an "Indian tribe" and receive the benefits of the IRA.

249.    Allowing the fee-to-trust benefit to inure to this group known as the Ione Band violates 42 U.S.C. § 1981 of the 1866 Civil Rights Act as enforced through 42 U.S.C. § 1983, which was written to prevent the government from being able to classify citizens differently to grant or deny rights and liberties in violation of the People's, including Plaintiffs,' due process and equal protection rights under the Fifth and Fourteenth Amendments.

## THIRD CLAIM FOR RELIEF

### FEE-TO-TRUST IS BASED ON THE REJECTED UNIFICATION THEORY THAT VIOLATES THE PROPERTY/TERRITORY CLAUSE (ARTICLE IV, § 3 Cl. 2) AND THE TENTH AMENDMENT OF THE CONSTITUTION

250.    Plaintiffs reallege and incorporate by reference paragraphs 1-249 of this Complaint as though fully set forth herein.

251.    Plaintiffs are entitled to maintain their local community under state jurisdiction separated from the federal government as a constitutional right protected by federalism.

252.    The U.S. Supreme Court has long "maintain[ed] that constitutional balance is not merely an end unto itself. Rather, '[b]y denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power.'" *Bond v. United States*, 572 U.S. 844,863 (2014) (quoting *Bond v. United States*, 564 U.S.

U.S. 211, 222 (2011)).

253.    Broad assertions of federal authority to regulate intrastate activities not only raise significant constitutional and federalism questions, but also result in a significant impingement of the traditional and primary authority and control that state and local governments have over land and water use. *EPA v. Sackett*, 143 S.Ct. 1322, 1355-1356 (2023) (citing *Solid Waste Agcy. of No. Cook Cty. v. United States ("SWANCC")*, 531 U.S. 159, 174 (2000)).

254.    "The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory qualify of life in both urban and rural communities." *Schad v. Mt. Ephraim*, 452 U.S. 61, 68 (1981).

255.    "An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable." *Bond*, 564 U.S. at 222.

256.    Individual citizens have a direct liberty interest in being able to participate and maintain a municipal government separate and independent of federal laws that legislate one uniform standard to be applied in all local communities. Municipal governance is the government that is closest to the people allowing it to recognize and encourage local diversity and creativity.

257.    The designation of the enumerated powers in the Constitution carefully balanced the powers between the States and Federal Government to preserve the liberty interests of the People to having as much local control as possible. Keeping government within the reach of the People's direct influence on their elected representatives is key to maintaining liberty of choice and creating innovation. The independence of the States and their municipal governments is essential to keep republican ideas of governance expanding.

258.    In *City of Sherrill*, the Supreme Court held that "the distinctly non-Indian character"

of a given portion of a state and its inhabitants, "the regulatory authority over the areas constantly

exercised by the State and its counties and towns" for more than a century following statehood,

and the tribe's "long delay in seeking judicial relief against parties other than the United States"

precluded such unilateral revival of the tribe's alleged ancient sovereignty, in whole or in part,

over the parcels at issue. *City of Sherrill* 544 U.S. at 198, 213-221.

259.    There are only two federal constitutional powers that are supposed to preempt state

law and state jurisdiction for the benefit of all Americans. The first is the Commerce Clause that

prevents local control from banning free sales of all goods in the stream of commerce or giving a

local advantage against out-of-State products. Local prejudice preventing the free flow of goods

was aptly demonstrated under the Articles of Confederation and was a major factor that the

Constitution corrected. The second preemptive power is contained in the Fourteenth Amendment,

Section 5, that the federal government can prevent States and local governments from

discriminating unjustly between individuals that deny due process and equal protection based on

unjust classifications such as race.

260.    Just as it is understood that the Commerce Clause prevents the United States from

allowing or creating monopolies or any laws that unnecessarily restrict the free flow of goods or

services between States without a compelling government reason, the Fourteenth Amendment was

intended to apply in the same manner to the federal government according to the Reconstruction

Congress.

261.    The United States is supposed to comply with the provisions of the Fourteenth

Amendment in administering the federal laws even though they were given authority to enforce

the same provisions against the States.  *See Daniels*, 474 U.S. at 332; *Adarand Constructors, Inc.*,

515 U.S. at 217-218, 224.   The enforcement granted in Section 5 against the States does not make

the four previous sections of the Fourteenth Amendment inapplicable to the United States as the USDOJ has falsely argued.

262.    Similarly, the Property/Territory Clause, Art. IV, Sec. 3. Cl. 2, was written to require the Congress to "dispose of the territories" and to create new states from the territorial lands.  This land policy had previously been adopted in the Northwest Ordinance. (*See* Act of Aug. 7, 1789, 1 Stat. 51, n.(a) (reproducing the Ordinance of 1787 enacted by the Continental Congress).

263.    The Framers of the Constitution did not expect or word the clause to allow the taking of state lands within the exterior boundaries of the former "territories" to be reacquired by the United States and turned back into "territorial land" not subject to the Constitution. Such a power would allow the Attorney General or the Secretary of the Interior to destroy the existence of a State.

264.    For such reason, this Court should rule that the power assumed by the Secretary of the DOI to reacquire state land and place it back under the absolute authority of the Property/Territory Clause, known as fee-to-trust, is unconstitutional and that the Secretary's claim of authority in Section 5 of the IRA is *ultra vires*.

265.    When President Andrew Johnson vetoed the 1866 Civil Rights Act, Congress not only overrode his veto with a two-thirds vote in both houses to adopt the Act, but Senator Lyman Trumbull, the primary author of the Act, vowed he would use it as a template for the Fourteenth Amendment.

266.    42 U.S.C. § 1981 was passed as a part of the 1866 Civil Rights Act and has always been applied to both the state and federal governments. The USDOJ has tried to limit the application of Section 1981 from applying to the United States and its officials by claiming it can only be enforced through Section 1983. Since the *Slaughter-House Cases*, 83 U.S. 36, 82 (1872),

the USDOJ has argued that the 1866 Civil Rights Act does not have an enforcement mechanism and can only be raised through the 1871 Civil Rights Act.

267.    The USDOJ has lied since it was created in June 1870, that the 1871 Civil Rights Act was only intended to apply against the States. The Congressional history clearly shows both Civil Rights Acts were intended to apply to both the State governments and the Federal government.

268.    Until the passage of the Fourteenth Amendment, there was no specific definition of the general duty the United States owed its citizens.

269.    This is not to say that the Bill of Rights or the Privileges and Immunities Clause did not create very real protections of individual rights. But neither created a dominant concept that placed all individual rights to due process of law and other rights under a single legal theory that all persons are entitled to equal protection of all the laws as enforced by the United States and by the States.

270.    Requiring that all laws are applied equally to all persons created a general trust responsibility in American government that finally replaces the British aristocratic trust obligation /responsibility owed to the People known as "Noblesse Oblige."

271.    The Indian trust created from the Pope's Doctrine of Discovery as interpreted by King George III and then inherited by the nascent United States was based on "noblesse oblige."

272.    The general trust of "noblesse oblige" does not work in a republican form of government that deliberately does not have a King or an aristocracy with special rights to and from the King.

273.    Placing the Indian trust relationship ahead of all other laws and responsibilities by having a direct policy of promoting tribal sovereignty has created a special class of persons and

federal bureaucrats that claim they can ignore the due process and constitutional rights of all other persons as well as the regular laws.

274.    The way the USDOJ and the DOI are interpreting the Indian trust relationship through the federal policy of promoting tribal sovereignty allows these Federal Departments to claim that they are operating outside and beyond the authority of the Constitution of the United States.

275.    The most unfortunate part of this Indian trust problem is that the Courts of the United States have issued many decisions approving of the Indian trust not being subject to the Constitution.

276.    Section 5 of the IRA delegates general authority to the Secretary of the Interior to acquire additional lands for individual half-blood or more Indians or recognized Indian tribes. Section 5 of the IRA, codified as 25 U.S.C. § 5108, copied this general language.

277.    There is a question regarding what Congress meant with the last sentence of Section 5 in the 1934 act. Congress said that "Title to any lands or rights acquired pursuant to this Act shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation."

278.    This general IRA Section 5 language can be interpreted in two different ways.  It either delegates to the Secretary the authority to take any lands or rights into federal trust, allowing them to be considered Indian country to make them tax exempt. Or it confines the ability of the Secretary to transfer additional federal public lands into federal reserves for Indians or to receive purchased lands for Indians within the reserves to be placed back under tribal and federal jurisdiction because they are already federal lands exempt from state taxes.

279.    Since the IRA, as passed and enacted, was cobbled together very quickly after the

extensive bill with its many hearings failed to pass the Senate, it is likely the language was left deliberately ambiguous to enable the USDOJ and DOI to claim a fee-to-trust authority that was specifically rejected by the Senate in the original bill.

280.    When the BIA claimed it could take fee lands into trust in Minnesota in 1936, the Senate immediately objected and threatened to repeal the IRA.

281.    The fight over the application of Section 5 of the IRA was finally decided by President Franklin Roosevelt in 1939 when he fired the Attorney General and replaced him with a new Attorney General who issued new regulations and a mandatory new form for use of all federal departments wanting to acquire state lands and place them under federal control. The idea of fee to trust was directly and specifically rejected by these actions.

282.    This lasted until 1980 when BIA promulgated the Part 120a regulations to allow fee-to-trust.

283.    Adding more federal public domain lands to Indian reservations or granting federal public land to individual Indians does **not** violate the Property/Territory Clause of the Constitution or the Tenth Amendment.

284.    It is possible that specific grants of federal public lands could violate the Fifth and Fourteenth Amendments. No such issue is present in this case. Transferring lands that retain federal jurisdiction into a different use under federal jurisdiction generally does **not** harm the States or local citizens.

285.    It is a closer question if lands that had been allotted and sold to non-Indian owners in fee within a reservation are again acquired by the Tribe and considered "Indian country," as if they had never been under state jurisdiction. This issue does not apply in this case.

286.    Until the U.S. Supreme Court issued its decisions in *City of Sherrill* and *Sturgeon*

*v. Frost (Sturgeon I)*, 136 S.Ct. 1061 (2016), the actual power behind the Indian trust relationship was **not** disclosed by the United States. Before then, the USDOJ and DOI steadfastly claimed that the Indian trust relationship was a benefit to Indians and all Americans and specifically did not harm any individual rights or liberty interests of non-Indian American citizens. We now know this is and was a deliberate lie.

287.    The language added to IRA Sec. 5 in 1988 presents another problem. *See* P.L. 100-581, 102 Stat. 2938 et seq., 100th Cong. (Nov. 1, 1988). Sec. 5 of the IRA was amended in 1988, by Sections 213 and 214 of Title II of P.L. 100-581, 102 Stat. at 2941, to include the following language: "SEC. 213. Subsection (c) of the Act of August 31, 1964 (Public Law 88-540; 78 Stat. 747, 25 U.S.C. 608(c)) is amended to read as follows: '(c) Lands and interests in lands acquired by the Secretary pursuant to section <span style="color:red">(a)</span> of this Act and for the benefit of the Yakima Indian Nation pursuant to section 5 of the Act of June 18, 1934 (48 Stat. 985; 25 U.S.C. 465) shall be held in trust by the United States for the benefit of the Yakima Indian Nation.'" "SEC. 214. Section 5 of the Act of June 18, 1934 (48 Stat. 985; 25 U.S.C. 465) is amended by striking out 'this Act' and inserting in lieu thereof 'this Act or the Act of July 28, 1955 (69 Stat. 392), as amended (25 U.S.C. 608 et seq.)'".

288.    Plaintiffs challenge the last two paragraphs of 25 U.S.C. § 5108 as being unconstitutional because they claim to grant a general fee-to-trust power to the Defendant Secretary of the Interior.

289.    According to the actual express language in 25 U.S.C. § 5108, Congress gave the Secretary the authority to do fee-to-trust transfers for only one Indian tribe, the Yakima Indian Nation. However, the statute has been broadly interpreted to apply to every tribe to claim a general domestic power to transfer fee lands under state jurisdiction back into federal trust and territorial

status.

290.    In *City of Sherrill*, the Supreme Court "reject[ed] the unification theory" pursuant to which inherent sovereignty through Indian title can be rejoined to lands acquired in fee as the result of open-market purchases from the current titleholders to again become federal Indian "country" or "territory." *City of Sherrill*, 544 U.S. at 214.

291.    Plaintiffs also claim that the 25 C.F.R. Part 151 regulations allowing parcels of land under state jurisdiction owned in fee to be placed into federal "trust" that reclassifies the lands as federal "territory" by making it "Indian country" are unconstitutional.

292.    No federal regulation or delegation of authority from Congress can convert fee lands that are under state jurisdiction back into federal public domain lands or "territory."

293.    If Indians are citizens of the United States as intended by Congress in passing the Indian Citizenship Act of 1924, 8 U.S.C. § 1401(b), the Indian trust relationship cannot be interpreted to exceed the enumerated powers of the federal government under the Fourteenth Amendment to the Constitution.

294.    If, however, Indians are deemed perpetual "wards" of the Nation incapable of being or becoming citizens of the United States, as Federal and Individual Defendants claim, the federal government must continuously act to protect their interests against all other American citizens and the States via exercise of territorial war powers in fulfillment of the Indian "trust." The United States claims this authority from the Pope's Doctrine of Discovery under the Indian trust relationship.

295.    The United States claims it is the recipient of powers reserved by the Indian tribes under the reserved rights doctrine that it may exercise in direct contravention of the Tenth Amendment that states that all reserved powers belong to the States and or the People.

296.    The Supreme Court of the United States last opined about the Indian "trust" relationship allowing the Indians to be treated as perpetual "wards" in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49  (1978), where it actually agreed that Indians were **not** under or necessarily subject to the Constitution. "Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." 436 U.S. at 55 (quoting *Worcester*, 32 U.S. at 559).  "As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority." *Santa Clara Pueblo*, 436 U.S. at 56.

297.    Plaintiffs state for the record that *Santa Clara Pueblo* was wrongly decided and that the Supreme Court of the United States has exceeded its authority under Article III judicial review to allow any agency or department of the United States to exceed the authority granted in the Constitution.

298.    The "Indian trust relationship" is a creation of the federal judiciary, admittedly at the request of the USDOJ and DOI attempting to create federal common law over Indians to preserve these territorial war powers of the Discovery Doctrine in perpetuity in the Executive Branch.

299.    Justice Brandeis was the first Justice to see through the federal power play in the 1930's, and he deliberately tried to prevent the federal judiciary from accepting that they needed to create "federal common law." Justice Brandeis was correct in his opinion, in *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938), that "[t]here is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a State whether they be local in their nature or 'general'…And no clause in the Constitution purports to confer such a power upon the federal courts."

300.    Chief Justice Roger Taney, in his 1857 *Dred Scott* decision, *supra*, agreed that the Indians are "wards" of the United States until the United States decides they are ready to be citizens. *Dred Scott*, 60 U.S. at 404.  According to Taney, Indians were/are capable of eventually becoming citizens unlike Black persons. 60 U.S. at 406-407.  But, for as long as the Indians remain "wards of the nation," the United States can use all of the powers exercised by King George III over the territories, including those in the Proclamation of 1763, and anything else they can convince the courts to accept to "protect" their "wards."

301.    This means that as long as the Indians are "wards of the nation," the United States can retain territorial lands indefinitely and make any and all laws and regulations over those lands outside of constitutional restraints. The very purpose of Judge Taney's *Dred Scott* decision was to legalize slavery in perpetuity in the territories.

302.    The Thirteenth Amendment formally ended slavery in 1865, while the 1871 Indian policy preserved the Indians as "wards of the nation" subject to the territorial war powers of the United States through today.

303.    In other words, the United States' preservation of Indian "ward" status pursuant to the 1871 Indian policy in furtherance of *Dred Scott* is tantamount to preserving "incidents of slavery" in violation of the Thirteenth Amendment.   The Thirteenth Amendment "is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *United States v. Stanley ("The Civil Rights Cases")*, 109 U.S. 3, 20-22 (1883), "While the immediate concern [of the Thirteenth Amendment] was with African slavery, the Amendment was not limited to that. It was a charter of universal freedom for all persons, of whatever race, color or estate, under the flag." *Bailey v. Alabama*, 219 U.S. 219, 240-241 (1911).

304.    The fact that the *Dred Scott* decision is still being used as "good" law by the United States today to preserve the "ward" status of the Indians and now to allow the federal government to challenge birthright citizenship, is just wrong.

305.    The continuing "ward of the nation" status of the Indians allows the Indian trust relationship to be used to destroy the character of any local community like Plymouth, CA. The communities' local concerns are completely ignored while the BIA and USDOJ promote tribal sovereignty to completely change settled local expectations, while federal officials with direct conflicts of interest manipulate federal laws to force the Plymouth community to have an unwanted Indian casino.

306.    "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

307.    The taking of the 13 parcels of land into trust by the Sacramento Regional BIA Consortium violates the rights and liberty interests of the Plaintiffs and similarly situated persons under 42 U.S.C. § 1981 by deliberately claiming and exercising without any statutory authority whatsoever the power to unite fee title with some non-existent claim to archaic Indian title under the rejected "unification theory" in violation of 42 U.S.C. § 1983.

308.    To be clear, Plaintiffs do not object to the idea that an Indian tribe may purchase additional lands or be given additional land.  Rather, Plaintiffs object to the racially discriminatory action the United States has taken by claiming and then exercising the ostensible authority to transfer these "Indian lands" into some completely undefined federal "trust status" that facilitates their removal from state jurisdiction and conversion into "federal territory," thereby rendering such land parcels completely beyond state jurisdiction and all local municipal control.

309.    There is no enumerated or general power under the Constitution that authorizes or allows the United States to remove or alter the jurisdictional status of real property (land) once it has been disposed of to the State.

310.    In *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 129 S Ct. 1436 (Mar. 31, 2009), the Supreme Court held that "'Congress cannot, after statehood, **reserve or convey** [] lands that have already been bestowed upon a State.'…'[T]he consequences of admission are instantaneous, and it ignores the uniquely sovereign character of that event…to suggest that subsequent events somehow can diminish what has already been bestowed.'" (emphasis added). *Hawaii*, 556 U.S. at 176 (quoting *Idaho v. United States*, 533 U.S. 262, 280, n.9 and 533 U.S. at 284 (2001) (Rehnquist, C.J. dissenting))

311.    *Hawaii* clearly followed and expanded upon the reasoning in *City of Sherrill* protecting settled expectations from federal interference by holding that the United States cannot change the means by which lands came under state jurisdiction. This comports with how any remaining federal lands upon statehood all become subject to concurrent jurisdiction until formally disposed of by the Congress.

312.    More recently, in *Oklahoma v. Castro Huerta*, 142 S.Ct. 2486 (2022), the Supreme Court held that "a State is generally 'entitled to the sovereignty and jurisdiction over all the **territory** within her limits', …includ[ing] Indian country." (emphasis added) *Castro Huerta*, 142 S.Ct. at 2493. (quoting *Pollard's Lessee*, 44 U.S. 212, 228 (1845)).

313.    In *Castro Huerta*, the Supreme Court rejected the Court's prior view expressed in its 1832 opinion in *Worcester*, 31 U.S. at 561, of reservation-occupying Indians as separate and distinct political communities or nations, 142 S.Ct. at 2493 (quoting *Organized Village of Kake v. Egan*, 369 U.S. 60, 72 (1962)), i.e., "of the relationship between Indian country and the States."

142 S.Ct. at 2502 (quoting *Organized Village of Kake*, 369 U.S. at 72).

314.    In *Castro Huerta*, the Court held, instead, that "Indian country within a State's territory is part of a State, not separate from a State" and is subject to **concurrent** State and Federal jurisdiction. 142 S.Ct. at 2494, 2504. "[T]he default is that States have criminal [and civil] jurisdiction in Indian country unless jurisdiction is *preempted*." *Castro Huerta*, 143 S.Ct. at 2493-2494.

315.    "The limitations that federalism entails are not therefore a matter of rights that belong only to the States. States are not the sole intended beneficiaries of federalism…An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable…" *Bond*, 564 U.S. at 222.

316.    Plaintiffs are longtime residents and taxpaying citizens of the sovereign State of California, the County of Amador and/or the City of Plymouth, that do not want their small town completely changed because Amy Dutschke, as the regional director of the Sacramento BIA who has the federal connections to get her family recognized as a tribe, stretched all reason and the rule of law to get lands taken into "trust" status so that she and her little family group can personally profit from the construction and operation of a casino that will destroy the quiet country town of Plymouth.

317.    There is no power or authority under the Constitution that allows lands disposed of/conveyed to a state that have been recognized by the state as private property under state jurisdiction to revert back to federal territorial status.

318.    Plaintiffs readily concede that there is a specific clause of the Constitution that authorizes the federal government to buy and or receive additional lands into ownership called the

Enclave Clause Art. I, Sec. 8, Cl. 13.   Lands purchased or conveyed under this clause require the approval of the State legislature **and** must be placed under **concurrent** jurisdiction.

319.    Federal and Individual Defendants, in the action at bar, are asserting and exercising powers under the "Indian trust" that are not within the structure of the Constitution, so that they can restore tribal sovereignty over newly acquired federal territorial lands they designate as "Indian country." This means they are actually asserting special rights and privileges only for the ostensible benefit of "Indians" and thereby making a racial classification with different rights and responsibilities that directly discriminates against the Plaintiffs and similarly situated persons in violation of 42 U.S.C. §§ 1981 and 1983.

## FOURTH CLAIM FOR RELIEF

### CONSPIRACY UNDER 42 U.S.C. § 1985

320.    Plaintiffs reallege and incorporate by reference paragraphs 1-319 of this Complaint as though fully set forth herein.

321.    "The civil-conspiracy prohibition contained in § 1985(3)…imposes liability on two or more persons who 'conspire…for the purpose of depriving…any person or class of persons of the **equal protection of the laws**.'" (emphasis added). *Ziglar v. Abbasi*, 237 S.Ct. 1843, 1866 (2017) (citing § 1985(3)).

322.    The Thirteenth Amendment to end slavery was passed by Congress during the Civil War with President Lincoln advocating for its passage, and it was ratified on December 6, 1865.

323.    Plaintiffs claim that, beginning in 1865, with the assassination of President Lincoln, Secretary of War Edwin Stanton began a conspiracy to deliberately preserve the territorial war powers from the Pope's Doctrine of Discovery unleashed in the *Dred Scott* decision to legalize slavery, and through it, a new Indian policy.

324.    Under the Indian Policy of 1871, all Indians became potential belligerents against the United States subject to the personal territorial sovereignty decision of the Congress or Executive as to what rights they could have. As noted above, this is still the law and can be used today against any person deemed an "Indian" residing on or off an Indian reservation. *See United States v. Bryant*, 511 U.S. 738 (2016).

325.    The 1871 Indian Policy was intended to formally end the assimilation policy of the Framers contained in the Northwest Ordinance of July 13, 1787, and in the Ordinance of 1787, *supra*.   The 1871 Indian policy is a much harsher direct war power policy toward the Indians. *See United States v. Lara*, 541 U.S. 193, 201 (2004).

326.    There are several acts that make up the 1871 Indian policy that was named for the statute that ended the practice of treaty-making with the Indians in 1871.

327.    First, there is the Indian Appropriations Act of March 3, 1871, Ch. 120, § 1, 16 Stat 544, 566, Rev. Stat. § 2079 (codified as 25 U.S.C. § 71).

328.    Second, there is the Act of March 3, 1849, Ch. 108, Sec. 5, Rev. Stat. § 441 (codified as 43 U.S.C. § 1457), Section 5 of which vests the Secretary of the then newly established United States Department of the Interior with the same powers and authorities to supervise public business relating to Indians that the Secretary of the War Department had previously exercised until such powers and authorities were transferred to the Interior Secretary on said date.

329.    Third, there is the Act of March 1, 1873, 42nd Cong., Sess. III, Ch. 217, Rev. Stat. §442 (codified as 43 U.S.C. § 1458), authorizing the Interior Secretary to exercise all the powers and to perform all the duties in relation to the Territories of the United States that the Secretary of State had previously exercised and performed until such powers and duties were transferred to the Interior Secretary on said date.

330.    43 U.S.C. §§ 1457-1458 utilize the Indian status and the unlimited territorial powers to equate the authority of the federal government over states with its authority over the territories.

331.    This new Indian policy of 1871 was intended to thwart President Lincoln's desire to "bind up the nation's wounds" and move forward to reunite the Nation. In other words, President Lincoln did not want to punish the Southern or Rebel States because he was afraid of how that "punishment" could be used to upset the structure of the Constitution.

332.    One of the last actions taken by President Lincoln before his assassination was to veto the first set of Reconstruction Acts against the Rebel States.

333.    Edwin Stanton as President Lincoln's Secretary of War vehemently disagreed with Lincoln, demanding that he agree to punish the South.

334.    Both Lincoln and Stanton were considered major war heroes. Lincoln was loved and respected while Stanton was respected and feared, reflecting their opposite styles of politics and major belief differences.    Members of Congress were split between the conflicting philosophies of the two powerful men.

335.    Lincoln was very adamant to get a Fourteenth Amendment that set a more complete vision for what the United States aspired to be. He saw the territorial war powers of the Doctrine of Discovery as being the great danger to the future of our Republic just as the original Framers had.

336.    Lincoln showed his understanding of the full intents and purposes of Chief Justice Taney in writing the majority opinion in *Dred Scott* in his famous debates with Senator Douglas over that very decision and what it meant to the republic.

337.    Towards the end of those debates, Lincoln began talking of using equal protection of the laws as the means to forever defeat the territorial war power problem we inherited from

Great Britain.  Lincoln said that Taney deliberately used the territorial war powers and the Indian trust relationship to claim he had made slavery forever legal in the United States.

338.    Chief Justice Taney's *Dred Scott* decision used a very expansive Indian trust relationship to rule that the Northwest Ordinance was unconstitutional and changed the interpretation of the Property/Territory Clause to allow the federal government to keep the federal public lands in perpetuity. Taney defined the unlimited territorial war powers as "the inevitable consequence of the right to acquire territory." *Dred Scott*, 60 U.S. at 444.  These rulings could be used in perpetuity to challenge how a state acquired jurisdiction over land.

339.    To counter this, the Thirteenth Amendment "reproduced the historic words of the ordinance of 1787 for the government of the Northwest Territory and gave them **unrestricted application within the United States and all places subject to their jurisdiction**." (emphasis added). *Bailey*, 219 U.S. at 240.

340.    Lincoln realized that requiring the United States to be bound to an equal protection clause would contradict the very basis of the claimed territorial power that allowed the British King to change personal status and the status of land solely at whim that had plagued our Colonist forefathers.

341.    Lincoln argued that since the Southern States had never been allowed to secede from the Union, they could not be treated as new or conquered territories. *See, e.g., Texas v. White*, 74 U.S. 700, 725-726 (1868) (concluding that Texas continued to be a State because the Union was indissoluble).

342.    Stanton represented the opposite side of this argument, that the Southern States had deliberately seceded and started a war that they lost making them a conquered people no longer a part of the United States.

70

343.    Stanton's power was great enough that he refused to leave his position as Secretary of War when fired by President Andrew Johnson. It was Stanton that led the fight to impeach President Johnson. Stanton refused to leave his office until his cancer became so advanced in 1869 that he knew he was dying.

344.    Stanton adamantly endeavored to find a way to preserve the United States having the territorial war powers against the newly adopted Fourteenth Amendment and its equal protection clause. He suggested creating the Department of Justice to represent the interests of the United States. He set up the legislation that was introduced by his best friend and Senator from Ohio, and it was later enacted in June 1870. *See supra.*  He created the USDOJ to keep the territorial war powers in the federal government. Congress passed the legislation creating the USDOJ as a tribute to Edwin Stanton just after he died.

345.    Congress in adopting the Fourteenth Amendment included a special provision for the Indians. All Indians not taxed would be excluded from the provisions of the Fourteenth Amendment. At the time the amendment was passed, the Fourteenth Amendment could not be used to challenge the 1871 Indian policy.

346.    Slavery was over, but the territorial war powers that the Framers and Lincoln believed could destroy the constitution had been strengthened, not lessened by Reconstruction. In 1876, Reconstruction ended, but the territorial war powers over the Indians stayed in place and are still in place today.

347.    By 1878, Congress started getting many complaints about how badly friendly Indian tribes were being treated under the 1871 policy. The 1871 Indian policy was the basis of the Indian Wars that were brought to force the Indians onto reservations.  The 1871 Indian policy was based on all Indians and Indian tribes as a race being deemed potential belligerents against the

authority of the United States, even though only about ten Indian tribes from the South had formed alliances with the Confederate States. *See Holden v. Joy*, 112 U.S. 94 (1872).

348.     Congress in 1878 reached back toward the old assimilation policy to again apply to the "friendly" tribes. Congress started passing laws that relied on the old assimilation policy that had been greatly improved by Presidents Lincoln and Grant to apply to Indian tribes not opposing the United States. This is the source of the "schizophrenic" Indian policy that was actually two contradictory policies being applied at the same time depending on how the tribe was categorized. *See Lara*, 541 U.S. at 220 (Thomas, J. concur.) ("Federal Indian policy is, to say the least, schizophrenic").

349.     There were no rules or regulations that applied to decide whether a tribe was friendly or hostile. It was entirely up to the military commanders assigned over each district. And different military commanders could alter the status of an Indian tribe at any time.

350.     The United States, since the creation of the USDOJ, has claimed that they are the successors-in-interest to the Proclamation of 1763 made by King George III.  This means that USDOJ claims pre- and extra-constitutional authority, just as King George III did, based on the Pope's Discovery Doctrine that gives the United States absolute authority over their Indian wards and absolute control over any property interest their wards have.

351.     One of the first things USDOJ wanted from Congress was approval to wield this authority. Congress passed the Major Crimes Act in 1885, Chap. 341, Sec. 9, enacted as the Indian Appropriation Act of March 3, 1885, 23 Stat. 385, 48th Cong., Sess. II, to grant USDOJ the authority to prosecute all major crimes committed by Indians on a reservation. The definition of "Indian country" in this act is identical to **"war zone"** which is defined as an area in turmoil that is not under the control of the government.

352.    In contrast, the Indian General Crimes Act of 1817, enacted as the Act of March 3, 1817, Ch. 92, § 1, 3 Stat. 383, created concurrent jurisdiction between the states and federal government for the enforcement of crime. "The Indian County Crimes Act served as the basis for the 1834 General Crimes Act, which was part of the final, permanent **Indian Trade and Intercourse Act**." (emphasis added).

353.    The modern definition of "Indian country," that is an area under tribal sovereignty, was passed in 1948.

354.    Some parts of the 1871 Indian war power policy have never been repealed.  Indeed, the Reconstruction power over Indians manifest in the Indian Policy of 1871 (25 U.S.C. § 71 (R.S. 2079)) deeming Indian tribes as a separate race of potential belligerents remains federal law, as Congress recently repealed as "obsolete" only 25 U.S.C. § 72 (R.S. 2080) pertaining to actual belligerent Indian tribes in Sec. 2(1) of the RESPECT Act. See P.L. 117-317, 117th Cong., 136 Stat. 4419 (Dec 27, 2022); RESPECT Act House Comm. Rpt. 117-606 (Dec. 7, 2022) at 4.

355.     With the discussions over the original IRA bills in 1934, Congress did repeal some of the 1871 policy to allow the BIA to set up tribal governments that reflect our own tripart system. The very limited IRA contained this mock tribal governments provision, and it became the assimilation law that was supposed to prove to Congress that the Indians were capable of self-governing. The enacted IRA did not limit or alter the fact that the unlimited territorial war powers were still in place.

356.    In fact, Section 5 of the IRA was written in a deliberately ambiguous manner as described above. The IRA was deliberately intermingled with the 1871 war power federal Indian policy to greatly expand federal jurisdiction against the States and the People.

357.    The USDOJ and the Department of the Interior are the main perpetrators of the

conspiracy against all Americans to preserve the territorial war powers by continuing to hold the Indians in "wards of the nation" status allowing the United States government to act as the successor-in-interest to King George III and the Pope's Discovery Doctrine in contravention of the Constitution of the United States.

358.    ""'[T]he Constitution… forbids…discrimination **by the General Government, or by the States**, against any citizen because of his race.'"" (emphasis added). *Students for Fair Admissions, Inc.*, 143 S.Ct. at 2161 (quoting *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (quoting *Gibson v. Mississippi*, 162 U.S. 565, 591 (1896) (Harlan, J. for the Court))).

359.    While Plaintiffs are affected by this overall conspiracy, they do not claim standing to challenge the entire scheme.

360.    Plaintiffs do claim that the USDOJ and members of the BIA solicitor's office have conspired to "recognize" the Ione Band of Miwok Indians, as described in detail above, to remove their rights to local control and quiet enjoyment of their private properties.

361.    Former BIA Commissioner Ada Deer had no authority to claim that she could separate and assign a special classification to a group that cohabitated on 40 acres of land and give special privileges to that group that have been denied to all others, in violation of 42 U.S.C. § 1981 as enforced as race-based discrimination under 42 U.S.C. § 1983, which require the United States like any State to adhere to the Fourteenth Amendment.

362.    The actions taken by multiple federal solicitors and BIA officials to approve or find legal support for the *ultra vires* action of Ada Deer amount to a federal conspiracy that violates applicable federal laws, namely the Tribal Recognition List Act, the 25 C.F.R. Part 83 process, and Section 19 of the IRA and its interpretation in *Carcieri*, denying these Plaintiffs and similarly situated persons due process and equal protection of the laws as a conspiracy under 42 U.S.C. §

1985(3).

363.    Federal and Individual Defendants have deliberately manipulated Section 5 of the IRA in order to take land into federal trust for an "Indian tribe" that was not recognized in any way before 1994, both denying there is a Congressional requirement that the IRA only apply to historically recognized tribes as of June 1, 1934, and ignoring the U.S. Supreme Court's interpretations of the IRA in *Carcieri* and *City of Sherrill*.

364.    In addition, Federal and Individual Defendants claim that their actions to accept the land into trust status displaces state jurisdiction and places the land back into federal territorial status as "Indian country." There is no enumerated constitutional authority that would allow such action as stated in *Hawaii*, *supra*.

365.    Neither the IRA nor any other federal statute allow this so-called "Indian tribe" to acquire land that is under state jurisdiction as detailed above. The BIA and USDOJ have unconstitutionally allowed the Sacramento Consortium to make fee-to-trust decisions that are **not** in accordance with law and that discriminate against all non-Indians in the area where the wrongly accepted lands are located.  In other words, Federal and Individual Defendants have committed racial discrimination in furtherance of a direct conspiracy in violation of 42 U.S.C. § 1985(3).

366.    "The basic principle [is] that the Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*." (emphasis in original). *Adarand Constructors, Inc.*, 515 U.S. at 227 (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)).

367.    "[T]he Equal Protection Clause…applies 'without regard to any differences of race, of color, or of nationality' – it is 'universal in [its] application.'" *Students for Fair Admissions, Inc.*, 143 S.Ct. at 2150 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)).

368.    These cumulative *ultra vires* actions amount to a deliberate conspiracy claiming the

Indian trust relationship in combination with the 1871 Federal Indian policy to promote tribal sovereignty to allow BIA solicitors and USDOJ attorneys to alter any federal law or federal court decision on behalf of the so-called "Indian tribe" to establish a tribal sovereignty that has never actually existed in this group against the constitutional rights of all other persons around the area, where the trust lands are claimed to be removed from state and local authority in violation of the equal protection of the laws, as enforced by 42 U.S.C. § 1985(3).

369.    What makes the actions of the Federal and Individual Defendants particularly egregious is the fact that the tribal recognition, fee-to-trust and IGRA treatment has been provided in abject disregard for the need to comply with the applicable statutes and regulations.  As the result, these actions appear as though they all were undertaken for the benefit of Amy Dutschke, Sacramento Regional Director of the BIA and a member of the so-called Ione Band of Miwok Indians.

370.    This is not only the type of conspiracy that has been broadly carried out against many persons across the state, the region and/or the nation, as the allegations of this Complaint have generally outlined.   Rather, this conspiracy is special, because the unlimited power that has been claimed at this particular location in California also reeks of **corruption**: Amy Dutschke has a direct personal pecuniary interest in getting the casino built for the Ione Band.  It was/is beyond unethical and improper for the Sacramento Regional Office and/or its Consortium to process all thirteen (13) of the fee-to-trust applications.  The DOI-BIA system using this unlimited power has now arrogantly progressed into openly discriminating "for their own" even when there is a glaring conflict of interest.

371.    "'At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not simply components of a

racial, religious, sexual or national class.'" *Students for Fair Admissions, Inc.* 143 S.Ct. at 2172 (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).

372.    All of the above actions have been and continue to be taken by USDOJ and DOI-BIA and other agencies pursuant to 43 U.S.C. § 1457, for the purpose of claiming the Fourteenth Amendment does not apply to the government of the United States despite the direct rulings of the Supreme Court of the United States.

373.    43 U.S.C. § 1457 contains a direct claim to the Civil War powers as preserved in and through the 1871 Indian policy. It was included in the 1965 (Johnson) Reorganization Plan No. 2 (Feb. 28, 1966, eff. May 10, 1966, 31 F.R. 6857, 80 Stat. 1608) in a deal struck by Richard Nixon and Robert Kennedy, Sr., to unleash these powers when one or the other became the next president. This was a major expansion of what Edwin Stanton had done during Reconstruction.

374.    The USDOJ and BIA, along with their officials, have deliberately promoted the Indian trust relationship and tribal sovereignty to claim the powers of King George III under the Doctrine of Discovery for almost 150 years, to prevent the Equal Protection Clause of the Fourteenth Amendment from ever applying to limit the sovereign authority of the government of the United States to only those powers enumerated in the Constitution.

375.    Federal and Individual Defendants and their predecessors have claimed that the promotion of the tribal trust and promotion of tribal sovereignty did not harm any other persons when they fully knew and understood that they were discriminating against the rights of the local citizenry and all private property owners in the area. This massive national conspiracy that is and was applied locality by locality must end. Plaintiffs request this Court to hold **all** of the Federal Defendants accountable for their deliberate actions in lying to the American public, Congress and the Courts in promoting this race-based conspiracy.

376.    "[S]ocietal discrimination…cannot 'justify a [racial] classification that imposes disadvantages upon persons…who bear no responsibility for whatever harm the beneficiaries of the [race-based preference] program are thought to have suffered.'" (emphasis added). *Students for Fair Admissions, Inc.*, 143 S.Ct. at 2173 (Thomas, J. concur.).

377.    "History has repeatedly shown that purportedly **benign** discrimination may be pernicious, and discriminators may go to great lengths to hide and perpetuate their unlawful conduct." (emphasis added). *Students for Fair Admissions, Inc.*, 143 S.Ct. at 2191. (Thomas, J. concur.).

378.    "[E]ven purportedly **benign** race-based discrimination has secondary effects on members of other races…'It should be obvious that every racial classification helps, in a narrow sense, some races and hurts others." (emphasis added). *Students for Fair Admissions, Inc.*, 143 S.Ct. at 2199. (Thomas, J. concur.).

379.    In sum, the U.S. Supreme Court, in *Students for Fair Admissions, Inc.*, explained in detail how the equal protection trust that is based on the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments to the United States Constitution should and must operate.  The Court held that the equal protection trust fulfills the foundational obligation of the Federal Government to treat all United States citizens as sovereign individuals, regardless of race, creed or color, and give equal opportunity under all laws.

Wherefore, Plaintiffs are entitled to declaratory and injunctive relief and to damages as set forth below in greater detail.

## PRAYER FOR RELIEF

A.    Declare that the Indian trust relationship as interpreted through the federal Indian policy of promoting tribal sovereignty, as stated above, for the Ione Band of Miwok Indians is

unconstitutional for violating the Fifth, Tenth, Thirteenth and Fourteenth Amendment rights of the Plaintiffs and similarly situated persons.

B.      Declare that if any overall trust exists between the United States and all the People and the States it is based on Section 1 of the Fourteenth Amendment, and that such trust requires the United States to treat all persons as having due process rights and the right to be treated equally to all other American citizens, without regard to race, creed, color, religion, ethnicity, bloodline, etc.

C.      Declare and find that Federal and Individual Defendants' "recognition" of the Ione Band of Miwok Indians and Ada Deer's inclusion of them pursuant to the Federally Recognized Indian Tribe List Act, in the "List of Tribal Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs," beginning in February 1995 (*See* 60 Fed. Reg. 9250, 9252 (Feb. 16, 1995)), was *ultra vires*.  Further declare that the Ione Band should be stricken from said list unless and until they comply with the Part 83 process.

D.      Declare and find that Federal and Individual Defendants' initial and ongoing acceptance into federal trust of 13 parcels of fee simple lands for Indian gaming purposes for the benefit of the Ione Band of Miwok Indians that were processed through the Fee-to-Trust Consortium, violated and continues to violate the Indian Reorganization Act that clearly states that only those tribes historically recognized and appearing on at least one of the four lists disclosed to the Supreme Court in *Carcieri* are eligible for the benefits of the IRA, and thus, that said Defendants are required to revoke the trust acquisition of the 13 parcels as *ultra vires*.

E.      Declare and find that the 25 C.F.R Part 151 regulations are unconstitutional because there is no constitutional authority delegated in Section 5 of the IRA to the Secretary of the Interior that allows fee lands to be converted back into federal territorial jurisdiction.

F.     Declare and find that Federal and Individual Defendants continued to conspire together under these federal laws as alleged above to knowingly and intentionally violate Plaintiffs' and other similarly situated persons' constitutional and civil rights, despite their awareness of Plaintiffs' civil and constitutional rights following the U.S. Supreme Court's landmark decisions in *Castro Huerta*, *Navajo Nation*, *Brackeen*, and *Students for Fair Admissions, Inc*., in violation of 42 U.S.C. § 1985(3), and thus, that said actions on behalf of the Ione Band are set aside as unconstitutional and *ultra vires*.

G.     Pursuant to Fed. R. Civ. P. 65(b), temporarily restrain Federal and Individual Defendants from continuing to exercise preconstitutional territorial war powers and continuing to commit all the above statutory violations, based on the Indian trust, against Plaintiffs and other similarly situated persons who continue to be irreparably harmed from such actions.

H.     Award Plaintiffs monetary damages and nominal damages in the amount of $100, and costs and attorneys' fees to the extent permitted by law including, but not limited to, the Equal Access to Justice Act (5 U.S.C. § 504); and

I.     Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated this 14th day of April 2025.

THE KOGAN LAW GROUP, P.C.

By:  */s/ Lawrence A. Kogan*
D.C. Bar ID: 492042
100 United Nations Plaza
Suite # 14F
New York, N.Y. 10017
Tel: (917) 565-1521
Email: <lkogan@koganlawgroup.com>

*Attorneys for Plaintiffs Dueward W. Cranford, II, Jon Colburn, William Braun, and the Citizens and the Citizens Equal Rights Alliance.*